Filed 12/15/20

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JAMES STANLEY KOENIG,<br><br>    Defendant and Appellant. | C074411<br><br>(Super. Ct. No. 09F4140) |

APPEAL from a judgment of the Superior Court of Shasta County, Bradley L. Boeckman, Judge.  Affirmed.

Cliff Gardner, Rudolph J. Alejo for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Senior Assistant Attorney General, Stephen G. Herndon, Supervising Deputy Attorney General, Carlos A. Martinez, Supervising Deputy Attorney General for Plaintiff and Respondent.

---

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts V through X and XII through XV of the Discussion.

1

A jury found defendant James Stanley Koenig guilty of 33 counts of securities fraud and enhancements — mostly involving Corporations Code section 25401[1] — and two counts of residential burglary. He was sentenced to an aggregate term of 42 years eight months. On appeal, defendant raises 15 contentions. As we shall discuss, we conclude the trial court erred by not instructing on mistake of law as to some counts and it erred in failing to define the term "indirect" for the jury as to one count. However, we conclude these errors were harmless and find no merit to the other contentions.

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

The 33 securities fraud and two burglary counts arose from the sale of securities to 31 individual investor victims. Between 2001 and 2007, each of those investors purchased one or more of 16 different investments (not including supplemental offers) from defendant's company.[2] And for each of those investments, it was the prosecution's theory that various material omissions or misstatements were made either through the offering documents or during the sale of the investment.

The trial lasted over three months, more than five dozen witnesses testified, and many hundreds of exhibits were introduced. Suffice it to say, we limit our discussion of the facts to those pertinent to the issues raised on appeal.

### Dramatis Personae

While many people worked for or were affiliated with defendant's companies (many of whom testified at trial), for purposes of the issues raised on appeal, several individuals and entities are key.

---

[1] Undesignated statutory references are to the California Corporations Code.

[2] There were many other investors and investments, but they did not give rise to charges or convictions.

Defendant was the owner of Asset Real Estate and Investment Company, Inc., known as "AREI," the company that issued the investments in question. Defendant also owned outright several other companies involved in those investments. And, he was part owner of several other companies involved.

Back in 1985, defendant pleaded guilty to two felony counts of federal mail fraud. He was sentenced to two-and-a-half years in federal prison, with five years of formal probation, and he was ordered to pay $5,000,000 in restitution. When probation ended in 1993, he signed a $81,187 promissory note for restitution.

In this case, defendant did not personally sell the securities at issue. Instead, all the securities at issue were sold by Gary Armitage.[3] Armitage was a full or part owner of several involved companies, and he was charged along with defendant but resolved his case for a 10-year sentence.

Also playing a significant role in the contentions raised on appeal were four attorneys, William Webster, Gilles Attia, Bill Tate, and Bruce Dravis, who advised defendant and AREI. Defendant maintains he relied on their advice regarding disclosure documents created for the investments.

**AREI and the Securities Offered**

From 2001 to 2007, AREI offered three types of securities at issue. Initially, it would acquire and develop land and facilities — often senior living facilities — financed through the sale of mortgage interests to investors. Investors would buy certificates of interest in a Limited Liability Company, which in turn held the mortgage. Investors would then receive monthly interest payments.

In 2004, AREI transitioned to selling "tenant in common" interests, known as "TICs." For these, AREI would identify senior living facilities and sell ownership

---

[3] Count 8 was alleged to have been sold by a different individual and the alleged victim was an employee of one of defendant's companies. The jury returned a not guilty verdict on that count.

interest to investors, who would hold them as tenants in common. Investors would receive monthly lease payments from a master lessee that would manage the facility, pay taxes, and serve as the sole tenant. The master lessee, an affiliate LLC created by AREI, would contract with Oakdale Heights Management Corporation — a company wholly owned by defendant — "to handle all of the daily care and marketing, food service, everything that has to happen in delivering the services at the senior housing community." AREI, for its part, received an "acquisition fee" for the TIC offerings.

In late 2004, AREI began offering the first of two corporate notes at issue. (Corporate Note I) The notes were essentially an unsecured debt offering of AREI. Investors would receive interest on the note. AREI would use the corporate notes to raise cash and to move investors out of poorly performing property investments. AREI began offering the second corporate note (Corporate Note II) in June 2007.

### A Brief History of The Fall of AREI

In September 2003, if not earlier, AREI grew concerned about some of its real estate investments. For some, the debt against the underlying asset was such that the investment was "significantly underwater" and investors couldn't be paid off if the asset was sold.

In response, defendant directed a then AREI vice-president to find a way to fix it. In early 2004, that vice-president devised Corporate Note I as the response. As the vice-president explained at trial: "the intent was rather than to have [investors] lose money on the sale of . . . those assets, we would move them into the corporate note which would give investors the ability to have the benefit of . . . cash flows throughout all of the AREI enterprises." An AREI employee who worked on Corporate Note I testified: "I recall [defendant] and [the then AREI president] commenting that this . . . is our get-out-of-jail-free card."

Corporate Note I issued in December 2004. In addition to swapping interests in other investments, interests in the note could be purchased with cash, and through this,

4

AREI raised "working capital," setting the initial cash offering at $1.5 million. But from April 2005 to December 2006, Corporate Note I was supplemented four times, with each supplement raising the cash offering amount, to $5 million, to $6.5 million, to $11.5 million, to finally $21.5 million.

The impetus for raising the debt offering was that AREI properties were underperforming, and in order to meet the obligations of running the properties and paying investors, additional cash was needed. As one employee testified: "Because investments in properties that we had made were not performing at the level that . . . were expected to be maintained. And . . . there was no interest in . . . down-sizing our management operation. . . . So, in order to maintain our operation and . . . supplement cash flow shortfalls of properties . . . the [additional debt offering] was needed." The employee also testified: "One of the large uses of proceeds of the corporate note was to lend money to AREI Senior Housing Properties to support some under-performing master lessees."

In May 2006, one of AREI's lenders discovered defendant's convictions and decided it no longer wanted to do business with AREI. AREI then had a pending acquisition that depended on the lender's underwriting. Asked what could be done, the lender demanded that defendant, who then held 100% of AREI, divest to a minority interest.[4]

"It has become apparent to me," defendant wrote in an email to company officers, "that AREI's growth has been hindered by my personal felony conviction in the past."

---

[4] AREI's CFO wrote the lender: "The organizations (AREI and [Oakdale Heights Management Corporation]) are run by the management in place and [defendant] spends the majority of his time teaching home school for his kids and looking at investment opportunities outside of the AREI/[Oakdale Heights Management Corporation] sphere." But at trial, the CFO testified that he was then in "constant contact" with defendant, who assisted in working with Armitage's firm "in continuing to raise capital and making decisions . . . on helping us to prioritize payment of obligations."

Defendant proposed selling 80 percent of his AREI ownership to its employees for $10 million. But he added, "I also will remain as a consultant to the company . . . and will be provided the company truck as an AREI owned vehicle," and "I will also have use of the corporate jet without prior approval . . . ."

In June, defendant entered into an agreement to sell 51 percent of his shares to Gary Armitage and four company officers. But in August, after the acquisition with the reluctant lender had gone through, defendant called a board meeting, announcing he would unwind the share sale, noting the shares had not yet been issued. And in November, defendant signed a "consent of sole director," appointing AREI's officers, including the president and CEO.[5]

By 2007, multiple tenant in common investments became unprofitable, generating insufficient cash flow to pay investors.[6] It was the same with Corporate Note I, with some note holders going unpaid by April 2007. When an employee spoke to the Chief Financial Officer about it, she was told, there's no money, and nothing can be done.[7] Another employee testified that defendant on multiple occasions told him that "Gary's [Armitage] got money coming in."

---

[5] AREI's former president testified that "layers" were created "so the institutional lenders felt [defendant] was distanced enough from the owner." "We had to create the LLC's to distance [defendant's] ownership," and "[w]e had . . . put the layers in to get some of the financing." Defendant's role, however, did not change.

[6] Around March 2007, investors in La Mesa, a tenant in common investment, asked what would be done to improve performance. Defendant was emailed a draft letter to those investors. He responded to an AREI employee: "Much better Michael [the vice president of finance]. Now you need to get [the then AREI president] to own it and Gary [Armitage] to approve it. Let me know the outcome."

[7] The minutes from a June 2007 "Department Head" meeting reflect that defendant "discussed the fact that we are going through some rough times right now, but we all need to focus on our jobs. We will pull through this."

In late May 2007, Armitage sent an email to defendant listing new funds coming from corporate note investors and directing that certain existing investors be paid with those new funds.

Also around that time, the debt ceiling on the fourth supplement to Corporate Note I was reached, and AREI began preparing Corporate Note II. When an attorney preparing the offering documents asked about AREI's ability to service the debt, an AREI employee explained that the only source for repayment was syndication fees earned for future tenant in common offerings. That employee testified at trial: "There was no steady cash flow or income stream to AREI except through additional syndications which were spotty."

Corporate Note II issued in June 2007. At the same time, defendant proposed rolling AREI's debt obligation into a new company and recapitalize it: "What if we create a new company and roll up the existing note holders into this company by trading stock for cash." He added: "Here is the beautiful thing, once all of the TIC owners are converted or paid off by people who buy in, the return to the investor will be terrific." AREI then owed $45 million on the corporate note, requiring $450,000 a month to service the debt. This was on top of $900,000 needed monthly to service underperforming assets and $450,000 for AREI's monthly overhead.

In July 2007, while a letter was being prepared for investors awaiting payments, defendant wrote in an email: "I guess I was hoping to get enough money in from Gary to pay it soon." A week later defendant emailed Armitage: "Need some money Gary. We are out."

Armitage responded in an email directing that certain investors be paid to buy "some time to raise some funds."[8] Defendant forwarded the email to the CFO of

---

[8] Armitage wrote: "[Defendant], I need to have [named victim in count 18's] Corp Note [payments] wired to her bank today, the FIServ Corp Note and her Roseville can wait. Send hers and [another named investor] via wire and I'll have some time to raise some

Oakdale Heights Management Corporation (owned by defendant), with the instruction: "Please follow this direction. Gary seems to think that if he can get these two people off his back he can raise the money we need for the [Corporate] Note."

At trial, multiple investor victims testified to having payments stop abruptly. Some testified to purchasing interest in Corporate Note II as late as August, October, and November 2007. One victim testified to calling Armitage for an explanation, who explained, "they were having troubles and they were going to refinance and everything would be all right." Payments never resumed.[9]

In late October 2007, defendant emailed the attorney, Bruce Dravis, writing: "AREI has sponsored some offerings over the years that are just not going to make it financially. We have advanced nearly $15,000,000 per year to the different entities over the past 12 months in hope that the properties would recover. They are not." Defendant went on to ask questions regarding investor suits and bankruptcy. He concluded by asking: "Since most people know that I founded all this mess, how will I be affected?"

**Private Placement Memorandums and the Omissions and Misstatements**

As required by law, when AREI sold securities, it provided investors with a written disclosure statement known as a private placement memorandum or "PPM."

---

funds. Confirm [yet another named investor's] distribution is going as well, Please. I'd like to call him to finish his 1031 and pick up the other $900k. We may need it to fund Fresno if I read your reservations right."

[9] Another victim testified that in the second half of 2007, he had a phone conversation with defendant after he grew concerned that Armitage "had a partner in the corporate notes who had a record of . . . fraudulent investment activities." The investor told defendant "I was concerned because I wasn't getting returns and I heard that there was a history of illegal activity and it made me very concerned about the security of my investment. And I wanted to get some reassurance from him." As to the conversation that followed, the victim testified: "I don't recall the conversation, but I do know that it became very argumentative. And at the end of the conversation, I had less than reassurance. I was fairly certain that my insecurities about the security of the investment were real and that there was a big problem."

These documents must disclose all "material information."  Attia, one of AREI's attorneys testified that an omission exists if the absence of particular information renders the information provided incomplete, inaccurate, or misleading.

At trial the prosecution highlighted five key omissions:  (1) that defendant had two federal felony convictions in 1985 for mail fraud; (2) that two earlier AREI investments were "oversubscribed"[10]; (3) that two earlier AREI investments had defaulted; (4) that property taxes for two AREI investments were delinquent; and (5) that payments had stopped for some investors as of April 2007.  Not all investment disclosure documents omitted these disclosures, and some investments were sold before certain omitted facts had come to pass.  And for 16 counts, it was alleged that in addition to the written omissions, Gary Armitage personally deceived investors while selling the investments.

During closing arguments, the jury was shown a large spreadsheet listing the many victims and the investments they purchased over the seven years.  And for each investment purchased, omissions and misstatements specific to that investment were listed.[11]

**The Four Attorneys and Their Advice**

At trial, one of the defenses raised was that defendant had relied on the legal advice of four attorneys.  All of them testified at trial.

**The First Attorney - William Webster**

Through a referral, defendant met with the first attorney William Webster in 1998.  Defendant told Webster about his mail fraud convictions, and Webster advised defendant the convictions need not be disclosed.

---

[10]  As attorney Attia testified, an investment is oversubscribed when the shares sold exceed the value of the "secured" underlying real property, leaving investors with "watered down" shares, not fully secured by the underlying asset.

[11]  The spreadsheet was not introduced into evidence.

At trial, Webster testified that he prepared PPMs for several of AREI's offerings, and none disclosed the convictions. He explained that in analyzing the issue, "there's not a black-and-white, crystal clear list of things that need to be disclosed when you're preparing a private offering memorandum. You look to what would need to be disclosed in a public offering. That's kind of the gold standard." He went on to say that Regulation S-K (setting out federal reporting requirements for public companies) then required the disclosure of convictions of control persons, but only those occurring in the past five years. Based on this, he "advised [defendant] that there was a reasonable basis for non-disclosure." He also concluded that no factors indicated an exception should be made for defendant's 13-year-old convictions, and moreover the investment offering was for a secured debt security, rather than a riskier equity security.

Webster, however, went on to testify that the client has the final determination of whether to disclose. He later clarified that he advised: "You can disclose it if you want to be very cautious. If you don't want to disclose it, though, there is a reasonable basis for non-disclosure." Webster also testified that it's the client's obligation to provide relevant and accurate information to him. Indeed, in his engagement letter he wrote to defendant: "You will be responsible for (1) providing me with all factual information available to you that may be necessary for me to perform my services or that we may otherwise request, (2) confirming the completeness and accuracy of all such information, and (3) updating me regarding any changes in such information."

Webster was replaced as AREI securities counsel in December 2001, but Webster continued to work for AREI "sporadically."

In July 2002, Webster sent a memo responding to a recommendation by AREI's new counsel, the Gray Cary law firm. Two earlier AREI offerings had been "significantly oversubscribed," and as a result, Gray Cary recommended that investors in an open investment be offered rescission. It also recommended that investors in an earlier investment, which Webster prepared, also be offered rescission. In the memo,

10

Webster wrote that there did not appear to be a duty to offer rescission. In part, he reasoned that the offering began in November 2001, filled quickly, and "[a]ccording to [defendant], it was filled before the AREI troubles arose."[12]

A rescission offer was, nevertheless, made, disclosing the oversubscription and offering investors their money back. At trial, Webster testified that he could not recall if defendant had disclosed the oversubscription of two prior AREI offerings: "He may have. . . . I don't recall."

In late 2002, Webster along with defendant created a mortgage fund company, Lakeside Financial Group, and Webster became its president. Its board members included defendant and Gary Armitage. In March 2004, the Lakeside board considered a proposal to invest $130,000 in an AREI note offering. Lakeside had previously invested $175,000 in the note, and the new funds would be used for AREI operating capital and to make payroll. Webster voted against it, citing the proposed use and noting that if a non-affiliated entity had proposed the investment, it would likely have been rejected. The proposal was nevertheless adopted when defendant and Gary Armitage voted in favor.[13]

### The Second Attorney - Gilles Attia

The second attorney, Gilles Attia, a securities law specialist with the firm Gray Cary, was retained by AREI in February 2002, to assist in preparing disclosure documents for several offerings of assisted living properties.

---

[12] In an October 2000 letter to Gary Armitage, with defendant copied, an AREI employee wrote that two AREI properties were oversubscribed and investors needed to be moved to other projects. During closing argument, the prosecution argued the letter showed defendant had misled Webster in telling him the investment had filled before oversubscription issues came to light.

[13] In June 2007, Webster wrote to defendant regarding that note and another investment: "In a few days Mountain House [Golf Course] will be down three months' interest payments, and AREI Combined Note two months. Any plans to get current?" Defendant responded that the note would be paid when another investment closes and as to Mountain House, "[it] is a bit of a struggle but we are working on a payoff of that also."

Attia was not initially told of defendant's criminal convictions, but early on, Attia "heard information" that spurred him to investigate. Defendant's convictions came to light after Gray Cary hired a private investigator. As Attia testified, "this was material information," and thereafter, Attia sought "to accurately disclose the information that we thought was material, while at the same time respecting [defendant's] privacy, since it had been many years since he had completed his sentence."

Attia's team drafted the disclosure: "A member of management to the partnership pled guilty to a mail fraud indictment in a criminal proceeding over 16 years ago. The partnership does not believe that these events call into question the current ability or integrity of such person." Attia testified that he believed the language was adequate and not misleading, and the disclosure was included in future offerings.

Nevertheless, in February 2004, defendant met with Attia to discuss removing the disclosure from an upcoming offering. Attia testified that at the meeting, "we outlined and explained our continued steadfast view that this was material information that needed to be disclosed." Attia advised that if defendant had "a role of control" or influenced decision-making affecting an investment outcome, the conviction must be disclosed. To avoid disclosure, defendant would have to have "no involvement, direct or indirect, no control, direct or indirect in the process by which the investment outcome would be an influence . . . ."

After the meeting, Attia sent defendant a letter summarizing the discussion. He wrote: "[T]here is no 'bright line test' for disclosure issuers such as this" and "this is a gray area, and what issues like this often come down to is what the court and jury decide following the bringing of a legal action, since it is they who will ultimately evaluate the materiality of the omitted information." He continued, "whether an omission is material for purposes of securities fraud depends on whether there is substantial likelihood that

12

disclosure of the omitted fact would have been viewed by a reasonable investor as having significantly altered the total mix of information made available."[14]

At some point, Attia learned that two prior AREI offerings had been oversubscribed.[15]  Attia advised that this too be disclosed.  His firm subsequently drafted language and advised AREI to include it.[16]  One subsequent offering document disclosed:  "[M]embers of the general partnership and/or their affiliates, including AREI, have been involved in certain offers of participation interests in promissory notes that were materially oversubscribed and in which proceeds may have been used for purposes that may not have been accurately disclosed in the relevant offering documents."  Similar language was included in several other subsequent offerings.  Some offerings prepared by Attia's firm also include the language:  "As a result of the over subscription, the company may have a contingent liability of up to seven million dollars."[17]

---

[14]  Attia also wrote:  "One possibility would be to divest yourself of any and all control over Mountain House [Golf Course], [Oakdale Heights Management Corporation], and AREI LLC. To do so you would either have to sell your interests in these entities, or contribute your interests *irrevocably* to a trustee.  Anything less would likely give the appearance that you had retained control over one or more of the entities, and thus in the event of a lawsuit the omission of the disclosure could form the basis for a strong fraud argument.  That would especially be true where the disclosure had been in the document previously, and then subsequently that disclosure was removed."

[15]  Attia testified that he believed the oversubscription resulted from inadequate "internal controls, management controls, and financial controls."

[16]  Attia elaborated:  "Just to be clear, the plan that we ultimately settled on was not just to deal with the disclosure of the over-subscription.  It also involved a whole array of other elements that were the basis for us getting comfortable, that we could continue representing the company, insofar as their internal controls, their adequate securitization of the notes that they were issuing because they were under-securitized."

[17]  The full disclosure reads:  "In or around June 2000, AREI . . . conducted an offering of participation interests in a note secured by a deed of trust made by the Company.  AREI accepted subscriptions in an amount materially greater than the $2,500,000 principal amount of the Note.  In or around March 2001, AREI conducted a second

In June 2004, Attia received a letter from AREI's president that it had "retained new counsel to finalize the Tenant in Common Offering . . . and will no longer require your services for these matters."[18]

At trial, Attia was also asked about defaults of two AREI properties in March and April 2003.[19] He testified that such defaults were also material facts: "I had information that that issuer had defaulted on a prior similar transaction or an important transaction, that could have affected the financial strength of the issuer and/or demonstrated an issue or problem with that — with respect to the issuer's ability to perform on similar instruments, it would absolutely be material."

---

offering of participation interests in a note secured by a deed of trust made by the Company. AREI again accepted subscriptions in an amount materially greater than the $5,210,000 principal amount of the Note. As a result of the oversubscriptions, the Company may have a contingent liability in the approximate amount of $7,000,000. In addition, the use of proceeds from these offerings may not have been adequately disclosed in the relevant offering documents. AREI and its affiliates are working to remedy the problems created by the oversubscriptions by preparing to refinance the affected note participation offerings, by improving internal controls (including achieving better segregation of the accounts of the ventures) and by strengthening the management of AREI and certain of its affiliates. Prospective investors may request additional information from the Company concerning the affected offerings and other projects sponsored by the affiliates of the Manager prior to purchasing Participation Interests."

[18] AREI's then-president testified the switch in attorneys was made "[b]ecause we were starting to do more tenant-in-common deals and Gray Cary didn't have the experience." The CFO similarly testified, "that was the reason we retained Hirschler Fleischer, . . . one of their lead partners was a leader in . . . TIC technology."

[19] These were Valdry Court and Quail Hollow. Corporate Note I disclosed that an AREI predecessor loaned $1 million to Quail Hollow. The note matured in March 2003, but approximately $1 million remained outstanding. AREI also loaned $4.6 million to Valdry Court. The note matured in April 2003 with over $3.8 million outstanding, though Valdry continued to make interest payments, and AREI elected to forebear pursing its rights.

**The Third Attorney - Bill Tate**

In June 2004, AREI retained the third attorney, Bill Tate, with the firm of Hirschler Fleischer. Tate and his firm prepared at least eight tenant in common offerings along with Corporate Note I.

Early on, AREI's president and vice president of finance asked Tate if AREI was required to disclose defendant's convictions. At the time, defendant was then CEO and sole shareholder. Tate testified that he advised that, "it would be to their benefit to disclose that, but that the law was not as clear as we would have liked it to have been. And that there were arguments that . . . weighed in favor of them not being required to disclose it."

Tate also testified that it's "the client's responsibility to make full and frank disclosure about their investments." And with any securities offering, "you send what you think is the final document to the client to have the client read it and certify to you that the information in the offering document is correct and complete."

When Tate was asked at trial why defendant's convictions were disclosed in Corporate Note I, but not in preceding offerings, he testified: "With any securities offering, we would advise the issuer to disclose anything of that nature. And in those particular cases . . . I could speculate as to why the client decided to decline our advice to disclose that. But with respect to the AREI, Inc. offering which [defendant] was the sole shareholder, . . . they agreed that the disclosure was appropriate in that instance."[20]

---

[20] AREI's then-president testified that around March 2005, she had a conversation with Tate. AREI was then holding meetings for certain investors, and Tate told her they couldn't continue to do that. When she relayed the advice to defendant, defendant said they needed to figure out how to continue to do them. The president refused, and defendant fired her.

Tate added that the convictions were disclosed in later offerings after "issuers sponsored by AREI were having difficulty getting loans because of the criminal conviction," and "we began to believe the conviction was a hindrance to financing."[21]

Tate was also asked why Corporate Note I had disclosed several properties in default, while the tenant in common offers did not. He testified: "After the corporate note . . . had been completed none of those notes [were] in default. And because none of the noteholders had ever taken any action or indicated that they had any issue with the fact that their payments were delayed . . . [or] wasn't repaid in full on time, suggested it wasn't a problem enough — wasn't enough of an issue to warrant mention in the tenant in common syndications. And also because they were obligations of . . . AREI and not of the issuer and really were unrelated to the issuer — the tenant in common syndications."

Tate continued: "[AREI obligations] were not so relevant that they warranted discussion at that point in the tenant in common syndications." When defense counsel asked, "So, there was an analysis made and a decision made and based on that . . . those disclosures were not put in the TIC models?" Tate answered, "That's right."

Tate was also asked why more recent offering documents included performance tables of other AREI investments, while earlier offerings had not. Tate testified that in 2007, "[w]hen it became clear that a number of the properties were under-performing and there was a . . . judgment made that the number of properties was significant enough . . . that it might be of relevance to an investor. [W]e advised the client that at that point, they should start including that sort of information."

In July 2007, Tate emailed defendant (along with the then AREI president): "[W]e need to add to the disclosures the fact that every property syndicated by AREI has

---

[21] This was also reflected in a December 2007 email from Tate to an outside attorney, with defendant cc-ed, where Tate wrote: "You will note from the outset we mention the conviction only in connection with the notes offering by AREI. As things progressed, we began to believe the conviction was a hindrance to financing."

missed some or all of its master lease payments for June and July." Tate went on to suggest that investors of cash-flow-positive properties were not receiving lease payments, and instead the money was being used to support cash-flow-negative properties: "This information in the master lease payment schedule disturbs me; particularly given the recent representations that the properties that were cash-flow-positive would make their lease payments out of their cash flow, that the properties that were cash-flow-negative would not make their lease payments as scheduled, and that the revenues collected by the master lessees would [sic] not being allocated among the properties based on the 'squeaky wheel' theory."

Tate concluded the email: "Offering materials that do not contain all the material information do no good to protect you in situations where investors lose money. I cannot do my job if I do not have full and frank disclosure from you and your group; half-truths and hidden facts will only exacerbate problems. I would like to help you fix the problems, but I cannot do that if I cannot rely on you to tell me what the problems are." Defendant responded, in part: "I agree with your email."

A week later, Tate wrote: "AREI has some explaining to do to the investors and continuing to ignore the investors, downplay the operational problems and hold back lease payments when the properties are generating cash to pay them is only making things worse." Defendant replied in part: "You know Bill somehow I think we know already the problems and how our clients feel."

### The Fourth Attorney - Bruce Dravis

The fourth attorney, Bruce Dravis was hired in April 2007 to draft Corporate Note II.[22] Dravis was a partner at Downey Brand, practicing transactional law.

---

[22] Tate testified he did not know why his firm was not retained to draft Corporate Note II. An AREI employee testified that defendant directed him to contact Dravis and use him to prepare Corporate Note II.

Dravis testified that preparing disclosure documents for debt offerings requires information on how the note will be repaid and the nature of the company's operations.[23] But asked about the work he did for AREI, Dravis testified, "It's been a long time and I don't recall all of the specifics." He recalled he had been contacted about a note offering and that he had also been asked to work on other potential offerings, but nothing came of the latter.

Dravis testified that in working on a private placement memorandum, "[o]ur obligations are to advise the client on the requirements of law and try to get them to abide by it." He also advises the client as to what ought to be disclosed and what need not be, but, "[i]t's ultimately the client's document. . . . I'm not the one who finally controls what the client does."[24]

---

[23] In a May 2007 email to AREI's CFO, Dravis wrote: "One material fact that we need to set out is the source of funds for AREI. Since AREI will be on the hook for the debt, even if one of the subsidiaries defaults on its obligations to AREI, investors will need to have an understanding of AREI's ability to service the debt. We need to set out what cash floats upstream to AREI." The CFO responded, "AREI's ability to service the debt is contingent on its ability to continue to syndicate future property acquisitions."

[24] In early June 2006, AREI's vice-president of finance was exchanging emails with Dravis, regarding disclosures for Corporate Note II. At one point, an advisor to defendant wrote to Dravis: "We have gotten to the point where this document had to be finished, so I have reviewed [the vice-president of finance's] final changes and updated a couple of important items and finalized the document." The advisor went on to note that the vice-president had resigned. He then concluded: "Sorry to be so brusque about finishing up this, but we have a transaction closing Friday with investors wanting to go into Corporate Note and existing note is almost full. So we are out of time." The vice-president was rehired a week later. Later that month, the vice-president emailed Dravis regarding disclosing in Corporate Note II unpaid Corporate Note I interest and property rent: "Of the estimated $920,000 in property rent payments due for May, almost all of it is still unpaid, which probably makes this one material to disclose." The vice-president also included sample disclosure language. Defendant's advisor responded: "I finalized the note 2 ppm after you left last week. I've attached a copy of the final ppm." Defendant's advisor then directed the vice-president to transmit the ppm to FISERV to be filed. The vice-president was then promoted to CFO. Citing these events, the prosecutor

Dravis also testified he could not recall having any information regarding the extent to which Corporate Note I was being paid prior to the disclosure documents for Corporate Note II being finalized.

### The Victims

Thirty-two victims testified at trial. Recounting all of their testimony would serve no purpose given the issues raised on appeal. But to illustrate the interplay between the victims, the investments, the disclosures, and Gary Armitage, we canvas the testimony of one victim, who along with his wife invested in seven AREI offers. They lost over $450,000, and four of their investments gave rise to count 11, a violation of section 25401.[25]

The husband met Armitage after his employer put on a financial training seminar run by Armitage's company. In September 2000, he and his wife made their first AREI investment, investing $30,000 in "Fox Run," which Armitage described as a shopping mall being built in Fresno. Armitage told them they would receive 12 percent interest, and their principal would be returned in two or three years. The victims were paid interest on Fox Run as promised and ultimately received their principal back.

In December 2002, they invested $50,000 in another AREI investment, Oakdale Heights Bakersfield, again sold to them by Armitage. This was a senior living facility in Bakersfield, and Armitage told them they would receive 8 percent.

In August 2003, they invested in three more AREI properties: Oakdale Heights Charlotte, Oakdale Heights Greensboro, and Mountain House Golf Course, investing $70,000, $70,000, and $60,000 respectively. The first two were senior living facilities.

argued at closing that it showed defendant putting people in place to obscure his responsibility for Corporate Note II going out, while investors were not being paid.

[25] Like the other victims, their involvement was also alleged as part of count 1, conspiracy to sell securities by means of false statement or material omission (Pen. Code, § 182, subd. (a)(1)1; §§ 25401/25540) and count 2, use of a scheme, device or artifice to defraud in connection with a sale of or offer to sell securities. (§ 25541)

19

According to the victim, "[Armitage] said they were great investments, doing very well. Goods [*sic*] return, excellent investments."

At some point, Armitage sold the victims an additional $75,000 investment in Mountain House Golf Course, using an IRA set up by Armitage. When that investment generated interest, Armitage reinvested it, ultimately growing the investment to $85,000. Also, through the IRA, $55,000 was invested in yet another investment, La Mesa.

In November 2006, both the Charlotte and Greensboro investments came due. At Armitage's recommendation, the victims withdrew $20,000 and rolled the remaining $120,000 into Mountain House Golf Course, bringing their non-IRA investment in it to $180,000.

In May 2007, after meeting with Armitage, the victims invested $136,620 in Corporate Note I. Armitage told them a lot of investments were on hold because of the real estate market, but the corporate note was yielding 11 percent. He also encouraged them to take the money out of an account where interest from their Oakdale Heights Charlotte investment had accumulated and roll it into the corporate note. Armitage told them they would earn more money in the corporate note than sitting in the account. He also said the corporate note was a temporary solution, and "in the near future," they could take out the money and invest in another option.

When the victims received supplements to Corporate Note I, increasing the debt offering, they signed off on them explaining, "we signed off on a lot of things that we just trusted Gary [Armitage] to know what he was doing. And there was a lot of papers to go through."

The same month that the victims invested in Corporate Note I, they stopped receiving returns on their Mountain House Golf Course and La Mesa investments. And the victims never received any returns in Corporate Note I.

In all, the victims lost their initial $180,000 investment and subsequent $85,000 IRA investment in Mountain House Golf Course. They lost the $136,620 invested in

Corporate Note I, and they lost $55,000 in La Mesa. The victims did, however, receive their principal back for Oakdale Heights Bakersfield in early 2008.

At trial, it was alleged that four of the victims' investments, Oakdale Heights Greensboro, Mountain House Golf Course (the IRA and non-IRA accounts were separately alleged), and AREI Corporate Note I, gave rise to count 11. The prosecution argued the Oakdale Heights Greensboro security was sold through Armitage's material misstatement that AREI was a great investment and doing very well. It was also argued that the offering documents failed to disclose (1) that two prior AREI investments were in default; (2) that AREI had a seven million dollar contingent liability because of a prior oversubscription; and (3) that defendant's felony was incompletely disclosed as it failed to name defendant and stated the partnership did not believe it called into question integrity or ability.

As to the non-IRA Mountain House Golf Course investment, it was the prosecution's theory that two prior defaults of AREI properties were not disclosed, and defendant's felony was incompletely disclosed. As to the IRA Mountain House Golf House investment, the prosecution theorized that the offering documents failed to disclose that taxes were delinquent as of June 2005 on another AREI investment.

Finally, as to Corporate Note I, the prosecution theorized that Armitage made a material misrepresentation when he told the victims they could earn more money with the Corporate Note than with the Lakeside Mortgage Account, and also that it was a temporary solution and the funds could be moved at a later time. The prosecution further theorized that the offering documents failed to disclose a contingent liability of roughly $7,000,000; the second supplement failed to disclose delinquent taxes as of June 2005; the third and fourth supplements failed to disclose that AREI was unable to get favorable loan terms due in part to defendant's felony; the fourth supplement failed to disclose that eight properties had negative cash flow, cash flow was negative $3,000,000, two

21

properties were in financial trouble, and some investors were not being paid.  Also, defendant's role in the company was also not disclosed.

The jury ultimately returned a guilty verdict on Count 11.

**Verdict and Sentencing**

Prior to jury deliberation, the trial court dismissed counts 5, 19, 24, 30, and 39. The jury ultimately found defendant not guilty on Count 8 but guilty on every remaining count:  Counts 1-4, 6, 7, 9-18, 20-23, 25-29, 31-38 and 41-42.  The jury also found the enhancement allegations true.[26]

The trial court sentenced defendant to an aggregate term of 42 years eight months.[27]

---

[26] The counts are as follows:

Count 1:  conspiracy to offer or sell securities by means of false statement or material omission with 20 overt acts (§ 182, subd. (a)(1)1; §§ 25401/25540);

Count 2:  use of a scheme, device or artifice to defraud in connection with a sale of or offer to sell securities (§ 25541);

Counts 3-13, 15-32, and 34-42: offer or sale of securities by means of false statement or material omission (§§ 25401/25540);

Counts 14 and 33:  residential burglary (Pen. Code, § 459), with allegations that another person, other than an accomplice, was present (Pen. Code, § 667.5, subd. (c)(21)).

Enhancement Allegations Counts 1-42:  The information also alleged that counts 1-42 were related felonies and involved the taking of more than $500,000 (Pen. Code, § 186.11, subd. (a)(2)) (white collar crime enhancement), and that defendant took property of a value exceeding $200,000 (Pen. Code, § 12022.6, subd. (a)(2)), exceeding $1,300,000 (Pen. Code, § 12022.6, subd. (a)(3)), and exceeding $3,200,000 (Pen. Code, § 12022.6, subd. (a)(4)) (excessive taking enhancements).

[27] The term was calculated as follows:  on count 4, sale of securities by means of false statement or material omission, the five-year upper term, a three-year middle term white collar crime enhancement (Pen. Code, § 186.11) and a four-year excessive taking enhancement (Pen. Code, § 12022.6), for a total term on the count 4 conviction of 12 years; on counts 14 and 33, burglary, a consecutive one-third the middle term sentence of

## DISCUSSION

## I. Jury Instructions on Conspiracy and

## Aiding and Abetting Liability for Violations of Section 25401

Defendant first contends the trial court erred in instructing the jury that it could convict him of section 25401 on either a conspiracy or aiding and abetting theory. He reasons that section 25401 is a crime of negligence and is therefore incompatible with those theories of liability. We disagree.

### A. Conspiracy Liability

### 1. The Trial Court's Instruction

Two elements are key regarding the target crime of the conspiracy, section 25401, offer or sale of securities by means of false statement or material omission. As instructed by the trial court, the People must prove: "1. The defendant *willfully* offered for sale or sold a security in California; [¶] [¶] AND [¶] 4. At the time the communication was made, *Mr. Koenig either: a. Knew that the communication included an untrue statement of material fact or knew the materiality of the omitted fact, OR b. Acted with criminal negligence in failing to investigate and discover the falsity and materiality of the statement or acted with criminal negligence in failing to investigate and discover the materiality of the omission*." (Italics added.) The court also defined "Willfully" as meaning to do something "willingly or on purpose"; and "Criminal negligence" as meaning a negligent act "which is aggravated, reckless or flagrant and which is a gross departure from what would be the conduct of an ordinary prudent, careful person under the same circumstances."

16 months for each count; on counts 6, 7, 9-12, 15-18, 20-23, 25-29, 31, 34-38, and 41-42, sale of securities by means of false statement or material omission, a consecutive one-third the middle term sentence of one year for each count; on counts 1, 2, 13 and 32, the three-year middle term, execution stayed pursuant to Penal Code section 654.

23

As for conspiracy, in pertinent part, the court instructed that to prove a conspiracy to violate section 25401, the People must prove: "1. The defendant intended to agree and did agree with Gary Armitage to commit the crime of sale of securities by means of false statement of a material fact or material omission in violation of Corporations Code section 25401/25540;[28] [¶] 2. At the time of the agreement, the defendant and one or more of the other alleged members of the conspiracy intended that one or more of them would commit the crime of sale of securities by means of false statement of a material fact or material omission in violation of Corporations Code section 25401/25540."

### 2. Analysis

Whether a jury instruction correctly states the law is reviewed de novo. (*People v. Posey* (2004) 32 Cal.4th 193, 218.)

A conspiracy is an agreement by two or more persons to commit any crime, and its proof requires four elements: " '(1) an agreement between two or more people, (2) who have the specific intent to agree . . . to commit an offense, (3) *the specific intent to commit that offense*, and (4) an overt act committed by one or more of the parties to the agreement for the purpose of carrying out the object of the conspiracy. [Citations.]' " (*People v. Martin* (2018) 26 Cal.App.5th 825, 831, italics added; (§ 182, subd. (a)(1)).)

Citing LaFave, defendant points out that one cannot conspire to commit a crime of negligence. (2 LaFave, *Substantive Criminal Law* (2d ed. 2003) Intent to Achieve Objective, § 12.2(c)(2) at p. 278 ["there is no such thing as a conspiracy to commit a crime which is defined in terms of recklessly or negligently *causing a result*."], italics added.)[29] We do not disagree with this proposition. A person cannot agree and

---

[28] Section 25540 provides the criminal penalties for a section 25401 violation, and as we discuss *post*, adds the element that the offer or sale had to be done *willfully*.

[29] LaFave illustrates the point with an example from the Model Penal Code: "[A]ssume that two persons plan to destroy a building by detonating a bomb, though they know and believe that there are inhabitants in the building who will be killed by the explosion. If

24

specifically intend to accomplish an unintended result.  But section 25401 does not proscribe a negligent act, nor does it proscribe a resulting harm.  As such it is not incompatible with conspiracy liability.

The actus reas of section 25401 involves a willful act, not a negligent act.  Section 25401 provides:  "It is unlawful for any person to offer or sell a security in this state, or buy or offer to buy a security in this state by means of any written or oral communication which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  Section 25540, which provides the criminal penalties for section 25401, includes a requirement that the conduct be *willful*.  (*People v. Simon* (1995) 9 Cal.4th 493, 522 (*Simon*).)  Accordingly, section 25401's actus reus — offering or selling a security by means of a communication that includes an untrue material fact or omits a material fact — must be done willfully.[30]

---

they do destroy the building and persons are killed, they are guilty of murder, but this is because murder may be committed other than with intent-to-kill mental state.  Their plan constitutes a conspiracy to destroy the building, but not a conspiracy to kill the inhabitants, for they did not intend the latter result.  It follows, therefore, that there is no such thing as conspiracy to commit a crime which is defined in terms of recklessly or negligently *causing a result*."  (LaFave, *supra*, § 12.2(c)(2), p. 278, italics added.)

[30]  Penal Code section 7 defines "willfully" as used in the Penal Code:  "The word 'willfully,' when applied to the intent with which an act is done or omitted, implies simply a purpose or willingness to commit the act, or make the omission referred to.  It does not require any intent to violate law, or to injure another, or to acquire any advantage."  In a footnote in his reply brief, defendant argues the Penal Code definition has no application here, but he has not challenged the definition of *willfully* as set forth in the instruction at issue.  To the extent he does so in this footnote, the challenge is forfeited.  (*People v. Carroll* (2014) 222 Cal.App.4th 1406, 1412, fn. 5; *People v. Bragg* (2008) 161 Cal.App.4th 1385, 1396-1397; *Evans v. Centerstone Development Co.* (2005) 134 Cal.App.4th 151, 160.)

Consistent with this, our high court has characterized section 25401 as a general intent crime.[31] (*People v. Salas* (2006) 37 Cal.4th 967, 976 (*Salas*), citing *Simon, supra,* 9 Cal.4th at p 507 ["section 25401 is a general intent crime, not one of strict liability"].) Still, "[a] general intent crime ordinarily requires scienter, i.e., guilty knowledge of the facts which make the act a crime." (*People v. Laster* (1997) 52 Cal.App.4th 1450, 1468.) For section 25401, our high court has defined the scienter element as "either (1) knowledge of the false or misleading nature of a representation or of the materiality of an omission, or (2) criminal negligence in failing to acquire such knowledge." (*Simon,* at p. 497.)

Critically, criminal negligence in this context refers to an alternative way of proving the knowledge element. It does not describe how the actus reas must be committed — and thus it does not convert section 25401 into a crime of criminal negligence.

We know of no California cases highlighting the distinction between a crime proscribing a negligent act and a crime with a scienter element requiring either criminal negligence in failing to discover a material fact or actual knowledge. But *United States v. Sdoulam* (8th Cir. 2005) 398 F.3d 981, provides an example under federal law. There, the defendant was charged with "conspiracy to distribute pseudoephedrine, *then having reasonable cause to believe* that such chemical would be used to manufacture methamphetamine." (*Id*. at p. 987, italics added.) The defendant argued the phrase " 'reasonable cause to believe' " created a negligence standard. (*Ibid*.) While agreeing that one cannot conspire to commit a negligent or unintentional act, the circuit court

---

[31] A crime is a general intent crime when the required mental state requires only an intent to do a proscribed act. (*People v. Hood* (1969) 1 Cal.3d 444, 456-457; *People v. Cole* (2007) 156 Cal.App.4th 452, 483 (*Cole*).) " '[N]o further mental state beyond willing commission of the act proscribed by law' is required" for a general intent crime. (*Cole*, at 477.) By contrast, a specific intent crime requires an additional "intent to do some further act or achieve some additional consequence." (*Hood*, at p. 457.)

26

concluded that conspiracy was appropriately charged because the distribution statute prohibited the commission of an intentional act: " '[a]ny person who *knowingly or intentionally . . . possesses or distributes* a listed chemical *knowing, or having reasonable cause to believe*, that the listed chemical will be used to manufacture a controlled substance.' " (*Ibid*.) The *Sdoulam* court thus concluded the defendant's argument that the "reasonable cause to believe" language converts the conspiracy to a conspiracy to commit a negligent act was "disingenuous." (*Ibid*.) The People cited and relied upon *Sdoulam* in their briefing on appeal, but defendant did not address it in his reply although he continued to maintain that section 25401 is a crime of negligence.

Instead, defendant principally relies on cases discussing implied malice murder. (*People v. Cortez* (1998) 18 Cal.4th 1223 (*Cortez*); *People v. Swain* (1996) 12 Cal.4th 593 (*Swain*).) He argues "a person cannot conspire (or intend) to commit a killing which lacks an intent to kill, since the very act of conspiring to kill would constitute an intent to kill." But this was not the reasoning underlying our high court's rejection of the crime of conspiracy to commit an implied malice murder. The court's focus was on the inchoate nature of conspiracy, which does not require the completed commission of the target crime, and the nature of implied malice murder which punishes a resulting death that was not intended. Our high court explained when a "killing is the *direct result*" of an intentional act, the natural and probable consequences of which are dangerous to human life, malice aforethought is implied. (*Cortez,* at p. 1229, citing *Swain,* at pp. 602-603.) " 'Hence, under an *implied malice* theory of second degree murder, the requisite mental state for murder—malice aforethought—is by definition "implied," as a matter of law, from the specific intent to do some act dangerous to human life *together with the circumstance that a killing has resulted from the doing of such act*.' 'It is precisely due to this nature of *implied malice* murder that it would be *illogical* to conclude one can be found guilty of conspiring to commit murder where the requisite element of malice is implied. Such a construction would be at odds with the very nature of the crime of

27

conspiracy—an "inchoate" crime that "fixes the point of legal intervention at [the time of] agreement to commit a crime" . . . [citation]—precisely because *commission of the crime could never be established, or deemed complete, unless and until a killing actually occurred.*' " (*Cortez*, at pp. 1229-1230, quoting *Swain*, at pp. 602-603, first italics in original, second italics added.)[32]

Accordingly, conspiracy is incompatible with an *unintended result crime*, such as implied malice murder. But no such limitation applies to conspiracy to commit a *prohibited act* crime, such as section 25401.[33]

Indeed, one of the sister state cases defendant relies upon discusses conspiracy relative to target crimes that proscribe conduct and crimes that proscribe a result. In *Donohue*, *supra*, 150 N.H. 180, the court, quoting commentary from the Model Penal Code concerning conspiracy, wrote: "[I]n relation to those elements of substantive crimes that consist of *proscribed conduct or undesirable results* of conduct, the Code requires purposeful behavior for guilt of conspiracy, regardless of the state of mind required by the definition of the substantive crime. *If the crime is defined in terms of*

---

[32] The court distinguished conspiracy to commit an intentional murder: "Since murder committed with intent to kill is the functional equivalent of *express malice* murder, conceptually speaking, no conflict arises between the specific intent element of conspiracy and the specific intent requirement for such category of murders. Simply put, where the conspirators agree or conspire with specific intent to kill and commit an overt act in furtherance of such agreement, they are guilty of conspiracy to commit express malice murder." (*Cortez*, *supra*, 18 Cal.4th at p. 1229, discussing *Swain*, *supra*, 12 Cal.4th at pp. 600, 602.)

[33] That distinction is also apparent in sister state cases defendant cites, which like *Cortez*, involved crimes that prohibited unintended results. (*State v. Donohue* (N.H. 2003) 150 N.H. 180, 182-186 (*Donohue*) [conspiracy to commit a reckless assault not cognizable; resulting injury required to prove assault]; *State v. Baca* (N.M. 1997) 124 N.M. 333, 344-345 [conspiracy to commit a depraved-mind murder not cognizable]; *Palmer v. People* (Colo. 1998) 964 P.2d 524, 529 (*Palmer*) [conspiracy to commit reckless manslaughter not cognizable; "Logic dictates that one cannot agree in advance to accomplish an unintended *result*"], italics added.)

*prohibited conduct, such as the sale of narcotics*, the actor's purpose must be to promote or facilitate the engaging in of such conduct by himself or another. If it is defined in terms of a result of conduct, such as homicide, his purpose must be to promote or facilitate the production of that result." (*Id.* at p. 183, italics added.) As the *Donohue* court observed, this portion of the Model Penal Code commentary "recognizes that one cannot conspire to commit a crime where mere recklessness or negligence *with respect to a result element suffices for the actor's culpability*." (*Id*. at p. 184.)

But section 25401 prohibits conduct. It does not require a resulting harm such as a death, injury or even monetary loss. Similar to the sale of narcotics, the prohibited act here involves the willful act of offering or selling something — a security. The sale must be by means of a communication that includes an untrue statement of material fact or omits a material fact, and as we have explained, the negligence theory in this context is merely one way to establish scienter. Accordingly, section 25401 requires neither a negligent act nor a resulting harm, the very elements that make crimes of negligence incompatible with conspiracy. We therefore conclude defendant was properly charged with conspiracy to violate section 25401.

### B. Aider and Abettor Liability

Defendant raises a similar argument as to aider and abettor liability.

### 1. The Trial Court's Instruction

The trial court instructed the jury that it could find defendant guilty of section 25401 under an aider and abettor theory: "To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that: 1. The perpetrator committed the crime; [¶] 2. The defendant knew that the perpetrator intended to commit the crime; [¶] 3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; AND [¶] 4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime. [¶] Someone aids and abets a crime if he or she knows of the perpetrator's

unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime."

## 2. Analysis

Defendant argues "aiding and abetting liability requires the defendant to 'share the specific intent of the principal,' " and one cannot specifically intend to commit an unintentional crime. Again, defendant's arguments are based on the premise that section 25401 is something it is not. Section 25401 is neither a specific intent crime nor a crime of negligence — it is a general intent crime, requiring that a defendant act willfully. (See *Salas*, *supra*, 37 Cal.4th at p. 976; *Simon*, *supra,* 9 Cal.4th at p 507.) And since there is no specific intent required of the direct perpetrator, there is no specific intent an aider and abettor must share.

"Under California law, a person who aids and abets the commission of a crime is a 'principal' in the crime, and thus shares the guilt of the actual perpetrator." (*People v. Prettyman* (1996) 14 Cal.4th 248, 259.) Generally, to be convicted under an aiding and abetting theory, a defendant must "act with knowledge of the criminal purpose of the perpetrator and with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense." (*People v. Beeman* (1984) 35 Cal.3d 547, 560.) If the offense charged is a specific intent crime, the aider and abettor must share the direct perpetrator's specific intent. (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117 (*McCoy*); *People v. White* (2014) 230 Cal.App.4th 305, 317 (*White*).)

But "if the charged offense is a general intent crime, the aider and abettor need only knowingly and intentionally facilitate the direct perpetrator's commission of the crime, without intending some additional result or consequence not required for the crime" and "the fact that an aider and abettor must harbor a specific intent to aid the direct perpetrator of general intent crime 'does not transform the underlying offense into a specific intent crime.' " (*White*, *supra*, 230 Cal.App.4th at p. 317, quoting *People v. Keovilayphone* (2005) 132 Cal.App.4th 491, 497; see also *People v. Torres* (1990) 224

30

Cal.App.3d 763, 770 [rejecting the contention that aiding and abetting the sale of heroin requires a specific intent; the sale of heroin is a general intent crime].)[34]

Accordingly, here, the jurors were properly instructed that the prosecution must prove defendant intended to aid and abet the perpetrator in committing the crime, and he had to know of the perpetrator's unlawful purpose and specifically intend to aid, facilitate, promote, encourage, or instigate the perpetrator's commission of the crime. And because section 25401 is a general intent crime requiring willful commission of the act of offering or selling certain securities, we reject defendant's contention that the jury was instructed on aiding and abetting an unintended crime.[35]

---

[34] Defendant also relies on attempt and solicitation cases to support his contention that the aiding and abetting instruction was improper. (E.g. *People v. Williams* (2013) 218 Cal.App.4th 1038 [attempt].) Because section 25401 is a general intent crime, defendant's reliance on attempt and solicitation cases is misplaced. Attempt and solicitation are separate crimes, and both require specific intent — thus the aider and abettor to an attempt or a solicitation must share the specific intent of the principal. (See *Williams*, at p. 1062.)

[35] We do not, however, hold that a person cannot be convicted of aiding and abetting an unintended results crime. Defendant cites no California case directly addressing this issue. Other jurisdictions have held that aider and abettor liability can extend to unintentional crimes committed by the principal. (See, e.g., *State v. Friday* (Kan. 2013) 297 Kan. 1023, 1040-1042 [reasoning that a defendant can be convicted of "aiding and abetting a reckless crime"]; *State v. Foster* (Conn. 1987) 202 Conn. 520, 527-532 [holding instruction allowing conviction for being an accessory to criminally negligent homicide was proper; distinguishing attempt and conspiracy cases involving unintended result crimes because attempts and conspiracy "are offenses in and of themselves"; noting "because accessorial liability is not a distinct crime, but only an alternative means by which a substantive crime may be committed, it would be illogical to impose liability on the perpetrator of the crime, while precluding liability for an accessory"; and noting liability attaches when the accomplice acts with the same criminal negligence as the direct perpetrator]; *People v. Turner* (Mich. 1983) 336 N.W.2d 217, 219 ["(O)ne can be an aider and abettor to the offense of involuntary manslaughter even though intent is not an element of the offense itself."].) Indeed, under the natural and probable consequences doctrine, an aider and abettor in California can be liable for an unintended crime, with the exception of murder. (*McCoy*, *supra*, 25 Cal.4th at p. 1117; Pen. Code § 189, subd. (e).)

## II. Instruction on Criminal Negligence

Defendant raises an additional challenge to the trial court's section 25401 instruction allowing the jury to find the scienter element based on criminal negligence. He contends that by including the term "willful" in section 25540, the Legislature intended a higher level of scienter: intent to defraud. Following a lengthy historical review and statutory analysis in his briefing, defendant maintains the word "willful" is incompatible with criminal negligence because it "require[s] proof of either a specific intent or a knowledge or awareness of the risk," and "the instructions here permitted the jury to convict [defendant] merely by finding that he was 'criminally negligent in failing to investigate and discover the falsity and materiality of the [untrue] statement or . . . omission.' "[36] Based on this, he asserts allowing the jury to convict on a criminal negligence theory was error. We disagree.

Defendant acknowledges *Simon* is the starting point for the analysis of this issue but goes to some length to obscure its holding. He maintains our high court, in *Simon*, "was not presented with — and did not therefore decide — what specific mens rea was actually required for a [section] 25401 conviction." He is mistaken.

---

[36] Defendant also asserts that before 1968, when the Corporate Securities Law was enacted, the California Supreme Court interpreted willful to mean: "something different from . . . negligence, however gross." He further asserts, our high court "had explicitly recognized that willful conduct required acting 'with *knowledge or appreciation of the fact*, on the part of the culpable person, *that [harm] is likely to result therefrom*." (Italics added.) He contends the Legislature was aware of these judicial discussions about the term willful when it enacted the Corporate Securities Law. For this, defendant relies on vintage civil cases. (*Norton v. Puter* (1934) 138 Cal.App. 253; *Goodwin v. Goodwin* (1935) 5 Cal.App.2d 644; *Turner v. Standard Oil Co.* (1933) 134 Cal.App. 622; *Parsons v. Fuller* (1937) 8 Cal.2d 463) In these lawsuits, injury had to be proved and thus proof of willfulness required an intent to injure or an awareness that injury was likely to result. Defendant again fails to recognize that section 25401 does not require any particular resulting harm. Also, the civil cases defendant relies upon are inapposite for the reason that they predate our high court's discussion of section 25401 in *Simon*, *supra*, 9 Cal.4th 493, and *Salas*, *supra*, 37 Cal.4th 967, which we discuss, *post*.

32

The *Simon* court considered whether sections 25401 and 25540 create a strict liability offense. (*Simon, supra*, 9 Cal.4th at p. 496.) Because section 25401 does not mention knowledge as an element (*Id*. at p. 507), the court examined "the entire regulatory scheme of the Corporate Securities Law of 1968" to determine the Legislature's intent. (*Simon*, at pp. 509-522.) Doing so, it noted the provision for civil liability, section 25501, permits damages or rescission only if the offeror was aware, or with reasonable care would have been aware, of the falsity or omission. (*Id*. at p. 516.) Based on this and its review of the legislative history, the court held that "*knowledge* of the falsity or misleading nature of a statement or of the materiality of an omission, *or criminal negligence in failing to investigate and discover them*, are elements of the criminal offense described in section 25401." (*Id*. at p. 522, italics added.) The court explained, "we presume the Legislature did not intend to enact a statute of doubtful validity. If knowledge or criminal negligence is not an element of the offense, criminal penalties would be imposed for conduct less culpable than that for which recovery in a private civil action is not permitted, an unreasonable application of the statutory scheme." (*Id*. at p. 522, italics added.)

Our high court repeated its *Simon* analysis in *Salas*, *supra*, 37 Cal.4th 967, and again in *Stark v. Superior Court* (2011) 52 Cal.4th 368, 398-399 [based on *Simon* analysis, actual knowledge or criminal negligence are alternatives to proving scienter for embezzlement by a public officer]. In *Salas*, it noted that in the 10 years since *Simon*, the Legislature "frequently amended" the Corporate Securities Law but had not abrogated *Simon's* holding by amending section 25401, despite the court's invitation to clarify " 'what mental states are elements of those which require scienter.' " (*Salas*, at p. 979.) That observation remains true today.

Based on *Simon* and *Salas*, criminal negligence is simply one of two ways of proving scienter (the other being actual knowledge). And we are bound by those holdings. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455-456,

33

(*Auto Equity Sales*).) Accordingly, we hold that the trial court correctly instructed the jury that it could convict defendant of violating section 25401 if it found he was "criminal[ly] negligent in failing to investigate and discover the falsity and materiality of the [untrue] statement or acted with criminal negligence in failing to investigate and discover the materiality of the omission."

### III. Legislative Intent Regarding Aider and Abettor Liability for Section 25401

In his next contention, defendant argues an additional reason why the criminal negligence instruction purportedly departed from the Legislature's intent. He points to section 25504.1, which provides: " 'Any person who *materially assists* in a violation of Section . . . 25401 . . . *with intent to deceive or defraud*, is jointly and severely liable with any other person liable under this chapter for such violation.' " (Italics added) He argues the Legislature could not have intended to impose criminal liability for an aider and abettor under section 25401 for criminal negligence, when civil liability requires " 'intent to deceive or defraud' " under section 25504.1. Again, we disagree.

"[A] court 'should ascertain the intent of the Legislature so as to effectuate the purpose of the law.' " (*Moyer v. Workmen's Comp. Appeals Bd*. (1973) 10 Cal.3d 222, 230.) " 'Our task is to select the construction that comports most closely with the Legislature's apparent intent, with a view to promoting rather than defeating the statutes' general purpose, and to avoid a construction that would lead to unreasonable, impractical, or arbitrary results.' " (*Poole v. Orange County Fire Authority* (2015) 61 Cal.4th 1378, 1385.) And for statutes enacted as part of the Corporate Securities Law of 1968, we construe them according to their purpose and by harmonizing them with related sections of the act to the extent possible. (*California Amplifier, Inc. v. RLI Insurance Company* (2001) 94 Cal.App.4th 102, 107-108.)

Here, defendant has pointed us to section 25504.1 — which requires intent to deceive or defraud for civil liability — in arguing a criminal prosecution of section 25401 on aiding and abetting theory must also require a showing of intent to deceive or

34

defraud.[37]  What this argument fails to consider is that section 25504.1 applies to secondary actors — people not associated with the offeror or the security.  (See Marsh & Volk, Practice Under the Cal. Securities Laws, (rev. ed. 2012) § 14.03[4][d] [section 25504.1 applies to persons who materially assist in a section 25401 violation, "regardless of their business or legal relationship to the vendor"].)

By contrast, section 25504,[38] a provision defendant overlooks, imposes joint and several civil liability on persons who have direct or indirect control over a person who is civilly liable under section 25501.  (*AREI II Cases* (2013) 216 Cal.App.4th 1004, 1013, 1015 [section 25504 extends liability to "secondary actors who assist in the primary violation"; "[u]nlike section 25504, which requires some sort of control person, employee, or agency relationship with the primary violator, section 25504.1 imposes collateral liability upon persons who materially assist in a violation of section 25401 regardless of their business or legal relationship to the primary violator"].)

Put simply, section 25504.1 casts a wider net than section 25504.  And critically, section 25504, like section 25501, provides a defense for persons who had neither actual knowledge, nor reason to believe there was a material misstatement or omission.

---

[37]  Section 25504.1 provides in pertinent part:  "Any person who *materially assists* in any violation of Section 25110, 25120, 25130, 25133, or 25401 . . . *with intent to deceive or defraud*, is *jointly and severally liable* with any other person liable under this chapter for such violation."  (Italics added.)

[38]  Section 25504 provides:  "Every person who directly or indirectly controls a person liable under Section 25501 or 25503, every partner in a firm so liable, every principal executive officer or director of a corporation so liable, every person occupying a similar status or performing similar functions, every employee of a person so liable who materially aids in the act or transaction constituting the violation, and every broker-dealer or agent who materially aids in the act or transaction constituting the violation, are also liable jointly and severally with and to the same extent as such person, *unless the other person who is so liable had no knowledge of or reasonable grounds to believe in the existence of the facts by reason of which the liability is alleged to exist*."  (Italics added.)

In our view, the provisions in section 25504 and 25504.1 signal the Legislature's intention to treat affiliated actors differently than those not affiliated with the offeror; thus, under section 25504, an "executive officer," such as defendant, need not materially assist or act with intent to deceive in order to incur civil liability. Such persons can only escape liability by establishing lack of knowledge or lack of negligence in failing to discover false statements and omissions. Indeed, as one court noted the requirements for 25504.1 are "understandably stricter than for control person or agent liability [under section 25504] because of the potential to impose joint and several liability upon persons *with a more attenuated relationship* with the primary violator." (*AREI II*, *supra*, 216 Cal.App.4th at p. 1016, italics added.)

In sum, because of the scienter requirement for section 25401, the analogous civil statute to that provision is section 25504, not section 25504.1. Defendant's contention therefore fails.[39]

## IV.  Mistake of Law Instruction

Defendant contends the trial court erred in refusing to instruct the jury on mistake of law as to the section 25401 and burglary counts. He maintains there was substantial evidence he relied on his attorneys' advice. We generally agree but find the error harmless.

### A.  Additional Background

The defense requested the following instruction on mistake of law: "The defendant is not guilty of a violation of Corporations Code section 25401/25540 if he did not have the specific intent or mental state required to commit the crime because he held in good faith a mistaken belief about the law. [¶] If the defendant's conduct would have been lawful under the law as he in good faith believed the law to be, he did not commit a

---

[39] We express no opinion as to whether someone who does not fit into one of the listed categories in 25504 could be liable as an aider and abettor in a criminal case.

36

violation of Corporations Code section 25401/25540. [¶] If you find that the defendant in good faith relied on the advice of his counsel he did not have the specific intent or mental state required for a violation of Corporations Code section 25401/25540. [¶] If you have a reasonable doubt about whether the defendant had the specific intent or mental state required for a violation of Corporations Code section 25401/25540 you must find him not guilty of that crime."

At the instruction conference, the trial court denied the request as unsupported by the law, explaining, "we have the circumstance here where it's still an alternative criminal negligence allegation. And if the defendant mistakenly believed the law to be supporting non-disclosure . . . but the People persuade jurors that to believe that was very unreasonable and therefore, it amounted to criminal negligence, then it's not a defense."

Trial counsel responded that advice of counsel goes directly to criminal negligence: "Is somebody criminally negligent not discovering something that they're paying thirty-five thousand dollars to an expert to give them advice in and their advice is, hey, it's unclear."

The court replied, "that's not our case . . . . It's not a case where the accused went to a lawyer, paid the lawyer good money, the lawyer said, you have no duty to disclose this and then the accused, therefore, did not. [¶] This is a case where lawyers told the defendant, among other things, at various times, it's unclear. Some said you should disclose it, err on the side of disclosing. Somebody else says you don't have to. And so, whether it's criminally negligent in the face of that kind of advice — and it varies, according to the time. It is for the jury to decide, not me." "I cannot tell [the jury] . . . if the defendant misbelieved the law, even if he was wrong but he had a basis for misbelieving it, he's home free. I just don't think that's the law."

The court went on to state: If "a jury in a given case concludes . . . the defendant not only actually believed, but in good faith believed that the law said he could do or not do what he's accused of doing or not doing, then there's ample instructions in the

37

criminal negligence instructions for jurors to see that it's not criminally negligent. You can argue it's not even negligent under the ordinary negligence standard, but it's not criminally negligent to rely in good faith on such advice. [¶] So, I think that's the safeguard for the defendant. But for me to instruct *the way you have this mistake of law is really taking that issue away from them* if they accepted that that's really what the defendant believed." (Italics added.)

Later, the court stated: "There may be some facts that you have in mind . . . that could be suggestive of what [defendant] believed with regards to legal opinion. And I'm certainly going to let you argue that. Whether I give this instruction is another issue."

Trial counsel sought to confirm, "what I'm hearing is, this is an argument to show reasonable doubt as to the elements, but it's not an affirmative defense within itself. Is that . . . what the Court's saying?" [¶] "Right," the court responded. "And as to the criminal negligence count, 25401, because there is the potential that jurors will believe that . . . to have such a belief was in itself criminally negligent. And, in fact, not in good faith. That the belief was so contrary to . . . legal advice . . . that it could not have been held in good faith." Counsel replied, "As long as we can argue it, reasonable doubt, the elements, I understand what the Court's saying." The court assured him: "[Y]ou can — both sides can argue about what legal advice. That's clearly been involved in the case."

### B. Analysis

#### 1. Mistake of Law and a Section 25401 Charge

We review a trial court's refusal to give a requested defense instruction de novo. (*People v. Manriquez* (2005) 37 Cal.4th 547, 581.)

On appeal, defendant argues mistake of law is a defense to section 25401's knowledge of a material omission, and thus the failure to instruct was error. The People respond that mistake of law is not a defense to a general intent crime. (See *People v. Young* (2001) 92 Cal.App.4th 229, 235, 237 [defendant's erroneous belief that the marijuana he was carrying was medicine under the Compassionate Use Act was not a

defense to the general intent crime of transporting marijuana]; *Cole, supra*, 156 Cal.App.4th at p. 483 [mistake of law not a defense to general intent crime].) And because section 25401 is a general intent crime, mistake of law is not applicable.

The People's argument misses two things. First, "[m]istake of law can be a valid defense when the crime requires specific intent if the mistake of law negates the specific intent of the crime." (*Cole, supra,* 156 Cal.App.4th at p. 483; *People v. Flora* (1991) 228 Cal.App.3d 662, 669; *People v. Vineberg* (1981) 125 Cal.App.3d 127, 137 (*Vineberg*).) And, here, defendant was prosecuted on derivative liability theories of conspiracy and aiding and abetting — both of which require specific intent to commit the target crime. Indeed, courts have specifically held that mistake of law applies to conspiracy charges. (See *People v. Meneses* (2008) 165 Cal.App.4th 1648, 1663, quoting *People v. Marsh* (1962) 58 Cal.2d 732, 743 [" ' "The association of persons with an honest intent is not conspiracy, and one of the tests on a conspiracy trial is, did the accused act in ignorance without criminal intent? In other words, did they honestly entertain a belief that they were not committing an unlawful act?" ' "]; *People v. Urziceanu* (2005) 132 Cal.App.4th 747, 775 ["Defendant's good faith mistake of law, while not a defense to the crime of selling marijuana, was a defense to the conspiracy to commit that crime"].)

Second, as discussed *ante*, section 25401 requires proof that the defendant harbored a particular mental state — actual knowledge or criminal negligence in failing to acquire such knowledge. And as our high court has explained: "There are a number of circumstances . . . in which violation of a penal statute is premised on the violator's harboring a particular mental state with respect to the nonpenal legal status of a person, thing, or action. In such cases, the principle is 'firmly established that defendant is not guilty if the offense charged requires any special mental element, such as that the prohibited act be committed knowingly, fraudulently, corruptly, maliciously or wilfully, and this element of the crime was lacking because of some mistake of nonpenal law.' " (See *People v. Hagen* (1998) 19 Cal.4th 652, 660 fn. 4, italics omitted.) For example,

39

"[A] taxpayer may defend against a [filing a false tax return] charge on the basis . . . that he mistakenly believed certain deductions were proper under the tax laws, but not on the basis that he was unaware it was a crime to lie on one's tax return." (*Ibid*.; Cf. *People v. Ramsey* (2000) 79 Cal.App.4th 621, 632 [mistake of law is not a defense to the general intent crime of discharging a pollutant into navigable waters; although the statute required the defendant to act intentionally and knowingly, the offense does not require a showing that the defendant knew the discharged material was a pollutant].)

We conclude that on either basis – mistake of law to negate specific intent or to negate the required knowledge – a mistake of law instruction was not incompatible with the charged conduct here.[40]

---

[40] As the trial court noted, defendant's proposed instruction was flawed. It would have told the jury, "If you find that the defendant in good faith relied on the advice of his counsel he did not have the specific intent or mental state required for a violation of Corporations Code section 25401/25540." Several nuances escape that instruction. First, defendant could have relied in good faith on the advice of counsel as to one material omission but not another. Second, defendant could have relied in good faith on what counsel advised, while at the same time that reliance could have been objectively unreasonable because of some external fact, resulting in objective unreasonableness, i.e. criminal negligence. Or, third, defendant could perhaps have relied in good faith on advice of counsel, while at the same time failing to investigate facts that might have altered counsel's opinion or rendered reliance on counsel's advice unreasonable or criminally negligent.

The pattern mistake of law instruction, CALCRIM No. 3411, by contrast, instructs that mistake of law is a defense only if it shows the defendant lacked the requisite mental state or specific intent: "The defendant is not guilty of [the charged crime] if (he/she) made an honest or good faith mistake about the law, if that mistake shows that (he/she) did not have the specific (intent/ [and/or] mental state) required for the [charged crime]." And while defendant did not request the pattern instruction, this court has held that a trial court must instruct, sua sponte, on mistake of law if supported by substantial evidence and not inconsistent with defendant's theory. (*People v. Urziceanu, supra,* 132 Cal.App.4th at p. 775.)

## 2. The Evidence Supporting a Mistake of Law Instruction

Still, a defendant is entitled to a mistake of law instruction only "if the evidence supports a reasonable inference that any such claimed belief was held in good faith." (*Vineberg, supra*, 125 Cal.App.3d at p. 137.) The instruction is properly refused if circumstances " 'indicate that although defendant may have "believed" he acted lawfully, he was aware of contrary facts which rendered such a belief wholly unreasonable, and hence in bad faith.' " (*Ibid.*) Nevertheless, all that is required to warrant the instruction is "evidence from which it can be inferred that defendant['s] alleged belief in the lawfulness of [his] conduct was in good faith . . . ." (*Id.* at p. 138.)

To that point, defendant argues the advice from the four attorneys sufficed to obligate a mistake of law instruction. As to the failure to disclose his convictions, defendant notes the first attorney, Webster, testified to determining, "[a]fter careful analysis," that defendant's prior convictions need not be disclosed. The second attorney, Attia, advised defendant to disclose the convictions and crafted disclosure language, which was included in three subsequent offerings. The third attorney, Tate, believed disclosure of the convictions would benefit AREI and protect against civil liability, but noted arguments against disclosing existed.[41] And as to Dravis, the fourth attorney, defendant argues that by the time Dravis drafted disclosures for Corporate Note II in 2007, defendant had given up the reins at AREI.

---

[41] Defendant also argues that Tate believed that "[b]ecause the issuer in the TIC offerings was Capitol Resource Fund, and because [defendant] owned an interest in this latter company solely through a limited partnership in which he was the limited partner (without control), [defendant's] prior conviction was omitted." Tate, however, did not testify that that was a reason for not disclosing defendant's convictions in the TIC offerings. Further, offering documents for TICs prepared in November and December 2005, show that ownership of Capitol Resources Fund was evenly split between a company defendant owned 99% of as a "limited partner" and a company owned by Armitage. Those TIC offering documents also place defendant first in the list of "officers, directors, and key employees of AREI and [Capitol Resources Fund]."

As to omissions of prior defaults and oversubscriptions of AREI investments, defendant argues Tate determined that disclosing the defaults and oversubscriptions in the tenant in common offers was unnecessary because the defaults had been cured through Corporate Note I and could only affect AREI. And, according to Tate, " '[AREI's obligations] were not so relevant that they warranted discussion at that point in the tenant in common syndications.' "[42] Defendant also asserts that the fourth attorney, "Dravis testified that he knew at the time [Corporate Note II was] syndicated that some investor payments had been missed, and the evidence showed that he nevertheless signed off on these PPMs."[43]

Finally, as to unpaid property taxes on AREI properties, defendant asserts that a former AREI CFO testified he was told by the then-president not to pay taxes on an AREI property because taxes did not need to be paid for seven years.

We agree a mistake of law instruction was warranted insofar as evidence gave rise to a good faith belief that the prior convictions need not be disclosed. Several attorneys testified to advising defendant that disclosure was not required, with Webster explaining that, under the public offering "gold standard," the conviction was too remote. Tate, similarly advised, "that the law was not as clear as we would have liked" and "there were

---

[42] Tate's testimony did not specifically reference the oversubscriptions, only "AREI obligations."

[43] Nowhere in the cited portion of Dravis's testimony does he testify he signed off on the offering documents knowing that some investors were not paid. Dravis testified, "[i]t's ultimately the client's documents. . . . I'm not the one who finally controls what the client does." The record also reflects that Dravis received emails about nonpayment of investors, but by trial, Dravis could not recall if that was true or if it was important. Similarly, when asked if he had information regarding the extent that Corporate Note I was being paid before the disclosure documents for Corporate Note II were finalized, he testified, "I don't have any idea. I don't know. I don't remember." But there was evidence in the record indicating that he had been made aware of these facts around that time. (See fn. 30, *ante*.)

arguments that . . . weighed in favor of them not being required to disclose it." While Attia made a "strong recommendation" to disclose the convictions (and disclosure language drafted by his firm was included in subsequent offerings), Attia also said "there is no 'bright line test' for disclosure issues such as this" and "this is a gray area . . . ." Dravis, the fourth attorney, provided no testimony regarding that disclosure, but by then defendant had been told by two attorneys that disclosure was not necessary.[44]

We conclude this evidence sufficed to warrant an instruction on mistake of law as to disclosing the convictions. We cannot say the same for the other material omissions, however.

As to the defaults, there was no evidence defendant was advised that there was a legal ground for not disclosing them. Instead, there was evidence indicating the contrary. Attia, the second attorney testified: "[if] I had information that that issuer had defaulted on a prior similar transaction or an important transaction, that could have affected the financial strength of the issuer and/or demonstrated an issue or problem with that — with respect to the issuer's ability to perform on similar instruments, it would absolutely be material."

To be sure, the third attorney, Tate testified there was "an analysis made and a decision made" to not disclose the defaults, and he explained, "[a]fter the corporate note . . . had been completed none of those notes was in default. And because none of the noteholders had ever taken any action or indicated that they had any issue with the fact

---

[44] We note, however, that any suggestion defendant had divested from AREI when Corporate Note II was prepared is not born out by the record. While defendant agreed to sell his shares in June 2006, in order to placate a lender, he quickly announced the rescission of that agreement after the loan went through. And though he was not re-elected to the board and appointed president until November 21, 2007, testimony and emails in the record demonstrate his control over the company before that time. Indeed, an AREI employee testified that defendant directed him to contact Dravis to draft Corporate Note II.

that their payments were delayed … [or] wasn't repaid in full on time, suggested it wasn't a problem enough — wasn't enough of an issue to warrant mention in the tenant in common syndications.  And also because they were obligations of . . . AREI and not of the issuer and really were unrelated to the issuer — the tenant in common syndications."  But that explanation misses a few things.

For one, that Corporate Note I — which defendant described as his "get out of jail free card" — had cured the defaults and obviated the need to disclose them, is called into question by the fact that a tenant in common offering prepared before Corporate Note I also failed to disclose the defaults.[45]  For another, the notion that multiple recent-past defaults of similar or important transactions — even if somehow cured — would not be information " ' "a reasonable investor would consider [] important in reaching an investment decision" ' " is simply unreasonable.  (See *People v. Butler* (2012) 212 Cal.App.4th 404, 421 [facts concerning defendant's history and the financial precariousness of the businesses in which defendant was offering investments was material and failure to disclose was sufficient to satisfy section 25401].)

Finally, while Tate emphasized that AREI's obligations were unrelated to the tenant in common syndications, his assertion rings hollow given that the disclosure documents for those tenant in common investments emphasized the number and value of AREI developments, with one stating:  "Since 2001, AREI and its Affiliates have acquired and/or developed 19 projects in seven states, and its annual property revenues now exceed $55 million.  Additionally, AREI has raised over $160 million in private offerings of debt and equity over the past three years."

A good faith mistake of law as to the oversubscriptions is similarly unsupported. Again, nowhere does the record show defendant was advised that nondisclosure of the

---

[45]  This was Modesto Capital Resources, LLC, a tenant in common offering, prepared in August 2004.

oversubscriptions was acceptable. Indeed, while Tate purportedly had reasons for the nondisclosure of the defaults and AREI's "obligations," the evidence does not establish he ever advised defendant that nondisclosure of the oversubscriptions was permissible. Rather, defendant received advice to the contrary. When Attia learned of the oversubscriptions, he advised that they be disclosed, and drafted disclosure language. Attia's firm also recommended that investors in an open offering be offered rescission due to the past oversubscriptions. The same recommendation was made for a previous investment in 2001 prepared by Webster. Though that rescission offer went forward, Webster recommended against it after defendant told him that the investment had filled before the oversubscription issue arose — an assurance undermined by a 2000 letter regarding the oversubscriptions, to which defendant was copied. (See fn. 12, *ante*.) From this, there is a reasonable inference that defendant was not only aware of the oversubscriptions, but he knew they were material enough to mislead one of his attorneys about them.

Finally, as to disclosing unpaid property taxes, defendant relies on testimony of an AREI CFO, claiming the AREI president told the CFO taxes need not be paid for seven years. Defendant misleads. The CFO's testimony was actually that "*defendant* and [the president] *both* advised me of what their understanding of California law was, that we had time to pay back taxes before the properties would be sold."[46] (Italic added) And in any event, the record is insufficient to conclude that defendant held a good faith mistake in law regarding disclosing unpaid property taxes, even if the properties were not subject to sale for the delinquencies at the time the disclosures should have been made.

In sum, the record supports an instruction on mistake of law as to defendant's prior convictions, but no other omission.

---

[46] On appeal, defendant's appellate counsel notes that a property is subject to sale after five years of nonpayment of taxes. (Cal. Rev. & Tax. Code, § 3691, subd. (a) (2004).)

### 3. Harmless Error

The error in failing to instruct on mistake of law, however, was harmless because even if the jury concluded defendant had a good faith mistake of law as to the need to disclose his past convictions, no count rested solely on that omission.

Of the 31[47] counts alleging a violation of section 25401, 16 were alleged to include misstatements by Gary Armitage (counts 3, 11, 12, 13, 17, 18, 20, 21, 22, 25, 26, 29, 31, 36, 37, 41).[48] And it is not argued on appeal that Armitage's misstatements were

---

[47] The 31 counts do not include the two burglary counts (counts 14 and 33) which were based on entry with intent to violate section 25401 and involved the victims in counts 13 and 32, and thus would be subsumed into those two counts.

[48] Evidence of Armitage's misstatements, as testified to by the victims, is as follows. Count 3: In November 2004, Armitage called Corporate Note I, "a great investment" and described AREI as "a booming enterprise. They were buying, they were turning it over, everything was going great." **Count 11:** As to Corporate Note I, on Armitage "persuasiveness," the victims "thought we could earn more money in corporate note than sitting in the Lakeside Mortgage" Armitage also told them Corporate Note I was a "temporary solution and that at some time in the near future we could take the money out of corporate note and invest in . . . another option." **Count 12:** As to Corporate Note I, "the wisdom [Armitage] shared with me is that if we spread our risk into more properties from specific properties, we would be protecting our assets better . . . . [¶] . . . [¶] [T]he strength of our investment would be strengthened by being in the note . . . over an individual property." **Count 13:** As to Corporate Note II, "[Armitage] said that it was liquid. I asked him if we would be able to get our money back any time we wanted and he said yes." [¶] "I asked Gary [Armitage] how I . . . could feel about getting my money back, if I could trust that I would be able to do that. And he said that [defendant] was a multi-millionaire and that he could support the company and my loan." **Count 17:** The victim told Armitage he wanted proceeds from an earlier AREI investment to go to cash. The victim later discovered the proceeds had been transferred to Corporate Note II. When he called Armitage to complain, Armitage falsely claimed victim had authorized the transfer. Armitage also said he would get the paperwork to transfer the money out, but the victim never got his money back. **Count 18:** As to Corporate Note I, Armitage told the victim it was secured by property. And as to authorizing a debt increase from 20 million to 25 million, "[Armitage] told me it was some sort of legalese." **Count 20:** Armitage said defendant was a "[b]rilliant businessman and critical to the success of AREI." And as to Corporate Note II, "Mr. Armitage assured [the victim] that it was a safe short-term investment." **Count 21:** As to Corporate Note I, based on Armitage's

46

statements in June 2007, "It was always our understanding . . . with Gary [Armitage] that . . . we were always going to be able to get to [our cash] when we needed it. … [W]e would be able to get it within a few days in our account." **Count 22:** As to Corporate Note I, Armitage said in April 2007, "it was a safe investment . . . ." **Count 25:** As to Corporate Note II, Armitage's statements led the victim to believe, "I could redeem it any time after about three or four months because they were going to sell some property or something. They had a big sale pending that was going to bring in money and then I could get the money back any time after that with a 30-day notice." **Count 26:** As to Corporate Note II, Armitage said the victim's principal could be accessed "At any time." When the victim told Armitage, "we understand that this is a safe real estate way to have some money quietly grow without risk," Armitage responded, "No problem. No-brainer." Armitage also said, "It was such a hot investment, they were running out of room, and we'd better get our money in now, because the first note was closing and maybe there'd be a second note." **Count 29:** As to Corporate Note II, Armitage said, "they were forming a new corporation to buy two more of these retirement centers, and this was to apply to those." "He said that he's going to become a partner with [defendant] on these two new investments, and he was going to supposedly put in twenty percent and [defendant] would take the rest." Armitage also said of Corporate Note II, "You'll get your money back any time you want," and "It's backed up by Corporation Number I." "Any time you want the money back, just ask for it and we'll get it." **Count 31:** Armitage called Corporate Note I, in June 2007, "a very, very good investment" and said "[h]e wished he could put money into it." **Count 36:** As to Corporate Note I, in May 2007, Armitage "said I would be better secured and get a better rate of return [than the victim's private mortgage company investment] if I invested in a corporate note with AREI. [¶] He also said that I owned some real estate and it had a lot of equity and I would be better off if I were to leverage the equity and use it by investing in some elder care facilities that I understood was part of AREI." "[Armitage] said that they were very safe. That AREI was a very successful, growing chain . . . of elder care facilities across the country. And the corporate note was protected by the strength of the corporation." **Count 37:** As to Corporate Note I, "I heard it was a great investment, that corporate was going to buy other properties and it would be good investment for them and for me." When the victim placed another investment, in early 2006, Armitage said, "things were going fine. The business is expanding and needed additional cash in order to make purchases." And before a purchase in November 2006, Armitage said, "things were going well" and "there was nothing stopping the corporation from acquiring additional properties at good prices and that things would continue." **Count 41:** As to Corporate Note I, in October 2006, "[Armitage] said it was short-term and it was guaranteed and there was no risk . . . ." "We could have [the principal] back whenever we wanted is what he told us . . . . And he guaranteed it. He had never had any clients that had lost any money."

47

susceptible to a mistake of law challenge, or challenged in any other way. Thus, the instructional error is harmless as to those counts.

Of the remaining 15 counts, two counts (counts 16, 35) involved the sale of Corporate Note II, which was first sold in June 2007, and which among other things, failed to disclose that other AREI investors were not receiving payments, and that AREI had a $45 Million debt obligation arising out of Corporate Note I. Accordingly, any instructional error would again be harmless as to those counts.

Of the remaining 13 counts, five counts (counts 4, 6, 7, 15, 28) involved either the investment Valdry Court or Oakdale Heights Fresno. Both investments had offering documents that failed to disclose that two previous AREI investments were oversubscribed. Thus, the error as to those counts are also harmless.

Of the remaining eight counts, six counts (counts 9, 10, 23, 32, 38, and 42) involved the sale investments (Mountain House Golf Course, Northridge, La Mesa, Oakdale Heights Charlotte, Oakdale Heights Greensboro, and Virginia Beach) that used disclosure documents that either failed to disclose the defaults of prior AREI investments or the unpaid property taxes.

Finally, the remaining two counts (counts 27 and 34) involved, inter alia, investments in Corporate Note I in April and May 2007, and both failed to disclose that some investors were not then receiving returns on the note. They also failed to disclose that eight AREI properties then had negative cash flow.[49]

There were other investments and omissions on which the 31 section 25401 counts could also have rested. Suffice it to say, no count turned solely on the failure to disclose defendant's conviction. Accordingly, the failure to instruct the jury on mistake of law was harmless.

---

[49] Other investments offered around the time disclosed that in 2005 eight AREI investments had negative cash flow. Corporate Note II reflected negative cash flow on 10 AREI properties.

48

## V.  Sua Sponte Instruction on Mistake of Law Defense to Counts 1 and 2

Defendant raises a similar contention that the trial court erred in failing to instruct on mistake of law as to counts 1 and 2.  But because his trial counsel did not request the instruction, he argues the court had a sua sponte duty to instruct on mistake of law as to those counts.

As discussed above, we agree the trial court was obligated to instruct sua sponte.  But as counts 1 and 2 arise from the same acts of selling securities through material misstatements or omissions, for the same reasons discussed above, the error was harmless as to counts 1 and 2.

## VI.  Sua Sponte Instruction on Corporate Officer Theory of Liability

Defendant contends the trial court erred in failing to instruct sua sponte on a corporate officer theory of liability for a section 25401 violation.  He argues the prosecutor, in closing arguments, inappropriately relied on a theory of corporate officer liability after withdrawing a request for an instruction in support of it.  The People respond that defendant misreads the record, and that the prosecutor's closing argument related to liability as a direct perpetrator, not a corporate officer.  We agree with the People.

### A.  Additional Background

The prosecutor proposed a modified version of CALCRIM No. 451, regarding corporate officer liability but withdrew the request after the trial court noted several problems with the instruction, including that it did not fit the prosecution's theory that defendant was "a continuing participant in a conspiracy and that he continued to commit various crimes even when he wasn't an officer because of his alleged ongoing control and

49

influence of what was going on."[50] Defendant did not object, adding only: "We're not asking for it."[51]

During closing argument, the prosecutor told the jury: "The defendant is culpable and guilty of this crime under three theories. He *personally committed it*. He's guilty of it by conspiring with Gary Armitage to do it. And he aided and abetted Gary Armitage in doing it." (Italics added.) The prosecutor went on to discuss the first theory: "He *personally committed* this crime not in plain sight, right? He did it behind the curtain. He did it behind a curtain of officers, of directors, of people that he put in place of AREI, people he put in place to manage AREI. He did it by way of the formation of corporate

---

[50] The trial court also said it would have refused the instruction had it not been withdrawn.

[51] The People's proposed modified CALCRIM No. 451 stated: "The defendant is charged with conspiracy to commit fraud in the offer or sale of a security; use of a scheme or artifice to defraud in connection with a sale or offer to sell a security; and the offer or sale of a security by means of false statement or material omission while acting as an officer or agent of a corporation. [¶] The People must prove that the defendant either personally committed or was a direct participant in the crime charged. The fact that the defendant is an officer or agent of the corporation is not sufficient by itself to support a finding of guilt. [¶] To prove that the defendant personally committed the crime charged, the People must prove that the defendant conspired to commit fraud in the offer or sale of a security; used a scheme or artifice to defraud in connection with a sale or offer to sell a security; and offered to sell or sold a security by means of false statement or material omission. The elements of these offenses will be further described in these instructions. [¶] To prove that the defendant was a direct participant in the crime charged, the People must prove that: [¶] 1. The defendant had authority to control the offer or sale of securities; [¶] AND, [¶] 2. The defendant failed to stop, authorized, caused or permitted the offer or sale of a security by means of a written or oral communication which included either: [¶] a. An untrue statement of a material fact or facts, or [¶] b. Omitted to state a material fact or facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; [¶] AND, [¶] 3. The defendant knew or should have known that the statement was untrue or misleading or the omission material. This is to be determined in light of the circumstances existing at the time of the offer or sale of the security." (Capitalization omitted.)

entities to do what he wanted to ultimately do, which is sell securities by way of misrepresentation — material.  [¶]  It's not that forming corporate entities is by definition criminal.  But it's the fact that the manner in which he did it and for what purpose, you can see, is how he perpetrated a violation of 25401.  [¶]  …  He also did it by . . . what he controlled and what he knew about AREI.  He controlled the information that he wanted to share with the various securities lawyers that AREI hired in order to prepare these [private placement memoranda].  He controlled what the investors would be getting in terms of information about the securities.  He controlled by whom these securities would be sold.  He gave the securities to Gary Armitage to sell.  [¶] . . . [¶]  This circumstantial evidence I'm going to ask you to consider when you consider whether or not the defendant personally committed the 25401."  (Italics added.)

In rebuttal, the prosecutor argued:  "The defendant offered these securities in several ways under several theories.  One, *personally*.  When I say personally, I don't mean that he physically . . . wrote up the PPM, got it reviewed, went out in the field and sold it.  I don't mean it like that.  Personally meaning he . . . controlled who was involved in the process.  He knew what was happening and sent them out to do it.  That's what I mean by personally committed it."  (Italics added.)

### B.  Analysis

On appeal, defendant argues that based on the prosecutor's comments, the trial court erred in failing to instruct sua sponte on corporate officer liability.  He argues the factors the prosecutor identified show she was relying on a corporate agent theory.  And without instruction on the theory of corporate officer liability the jury convicted based on a "homespun theory of corporate officer liability."

In a criminal case, even absent a request, the trial court must instruct on " ' "the general principles of law relevant to the issues raised by the evidence," ' " that is " ' "those principles closely and openly connected with the facts before the court, and

51

which are necessary for the jury's understanding of the case." ' " (*People v. Breverman* (1998) 19 Cal.4th 142, 154 (*Breverman*).)

Here, the prosecutor did not argue defendant was guilty under a corporate officer theory of liability; instead, she stated that defendant "personally committed" the crimes, conspired with Armitage, and aided and abetted Armitage. To the extent she discussed defendant's actions as an officer of AREI, it was in the context of defendant's personal acts and knowledge.[52]

The contention therefore fails.

## VII.  Instructions Referencing Armitage as "defendant"

Defendant contends several instructions referred to Gary Armitage as "defendant" and therefore misled the jury. He claims that because the burglary instruction referred to "the defendant entered a building" with the requisite intent, and there was no evidence that he himself entered the building (only Armitage did), the jury could have believed "defendant" in the burglary instruction referred to Armitage and thus "defendant," in the section 25401 instruction likewise referred to Armitage. We find no error.

### A.  Additional Background

One example of the challenged instruction told the jury that:  "*The defendant* is charged in Counts 14 and 33 with burglary in violation of Penal Code section 459." It continued:  "To prove that the *defendant* is guilty of this crime, the People must prove that:  [¶]  1.  The *defendant* entered a building; [¶]  AND  [¶]  2.  When he entered a

---

[52] We note, however, that because Armitage sold the securities, defendant could not be a direct perpetrator.  Nor could he be liable as principal for acting through an agent because Armitage was not an innocent agent.  (See *Simon*, *supra*, 9 Cal.4th at p. 522, fn. 19, quoting 1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Introduction to Crimes, § 92, p. 108 ["person liable as principal if he or she 'authorizes or otherwise causes a crime to be committed through the instrumentality of an innocent agent' "].)  Defendant does not assert the prosecutor's comments were erroneous and thus we have no cause to further consider them.

building, he intended to commit the sale of securities by means of false statement of a material fact or material omission in violation of Corporations Code section 25401. [¶] To decide whether the *defendant* intended to commit the sale of securities by means of false statement of a material fact or material omission in violation of Corporations Code section 25401 please refer to the separate instructions I will give you on that crime." (Italics added.)

## B. Analysis

When considering a challenge that a jury instruction was misleading, we look to the instructions as a whole to determine the probable effect of the instructional error, if any. (See *People v. Van Winkle* (1999) 75 Cal.App.4th 133, 147.) We ask if there's a reasonable likelihood the jury understood the instruction as claimed. (*People v. Cross* (2008) 45 Cal.4th 58, 67-68 (*Cross*).)

Here, it is not reasonably likely the jury understood the instructions to mean Armitage since Armitage was not a defendant in the case. The burglary instruction began by telling the jury that, "*The defendant* is charged in Counts 14 and 33 with burglary . . . .," corresponding to the counts against Koenig. The prosecutor argued defendant was vicariously liable for burglary because he acted *through* Armitage, entering the residences with the requisite intent. Accordingly, no reasonable juror would believe "defendant" in the first element meant Koenig as opposed to Armitage.

Moreover, the term "defendant" in the section 25401 instruction clearly refers to Koenig. The instruction began with, "Mr. Koenig is charged in Counts 3, 4, 6-13, 15-18, 20-23, 25-29, 31-32, 34-38 and 41-42 with securities fraud in violation of Corporations Code § 25401." A reasonable jury would not have found the use of the word "defendant" interchangeably with "Mr. Koenig" in this instruction confusing or a reference to Armitage.

# VIII. Conspiracy Instructions

As to Count 1, defendant challenges the conspiracy instruction because it referred only to his mens rea and omitted any mens rea for Armitage. He concedes the court properly instructed the jury that to find conspiracy it must find Koenig and Armitage agreed to commit a violation of section 25401. But he argues the court erred in instructing the jury, "[t]o decide whether the defendant *and one or more of the other alleged members of the conspiracy* intended to commit the crime of sale of securities by means of false statement of a material fact or material omission in violation of Corporations Code [sections] 25401/25540, please refer to the separate instructions that I will give you on that crime." (Italics added.) Defendant asserts, "[t]he trial court's [section] 25401 instruction *omitted any mens rea element as to Armitage entirely.* Instead, the only mens rea element in that separate instruction applied to 'Mr. Koenig.' " He asserts this was error. We disagree.

" 'Generally, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' " (*People v. Hudson* (2006) 38 Cal.4th 1002, 1011-1012; accord, *People v. Canizalez* (2011) 197 Cal.App.4th 832, 849 [challenge to former CALCRIM No. 400's " 'equally guilty' " language forfeited by the failure to object]; *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1163 [same].) Here, the court's instruction was correct in law and responsive to the evidence. Defendant's belated argument on appeal that the instruction was incomplete or required clarification is forfeited.

Furthermore, it is not reasonably likely the jury understood the instructions as defendant claims. (See *Cross, supra*, 45 Cal.4th at pp. 67-68.) A reasonable jury would understand the knowledge element in the section 25401 instructions applied to both defendant and Armitage in the context of the instructions on conspiracy. And considering the instructions as a whole, a jury would understand that Armitage, as

coconspirator, must have the same knowledge as defendant based on the court's instructions that the jury needed to refer to the instructions on mens rea for section 25401 to determine whether "defendant *and one or more of the other alleged members of the conspiracy* intended to commit the crime." (Italics added.)

The contention therefore fails.

## IX. Instruction on Coconspirator's False Statements

Defendant contends the trial court erred in departing from the standard CALCRIM No. 417 instruction. Zeroing in on paragraphs 1 and 3 of the instruction as given, he maintains the modification allowed the jury to convict for conspiracy even if defendant did not intend to violate section 25401. We disagree.

### A. Additional Background

The court instructed the jury: "A member of a conspiracy is criminally responsible for the crimes that he or she conspires to commit, no matter which member of the conspiracy commits the crime. [¶] A member of a conspiracy is also criminally responsible for any act of any member of the conspiracy if that act is done to further the conspiracy and that act is a natural and probable consequence of the common plan or design of the conspiracy. This rule applies even if the act was not intended as part of the original plan. … [¶] A member of a conspiracy is not criminally responsible for the act of another member if that act does not further the common plan or is not a natural and probable consequence of the common plan. [¶] To prove that the defendant is guilty of the crimes charged . . . under this theory, the People must prove that: [¶] 1. The defendant conspired to commit the following crime: sale of securities by means of false statement of a material fact or material omission in violation of Corporations Code section 25401/25540; [¶] 2. A member of the conspiracy committed the crime of sale of securities by means of oral false statement of a material fact in violation of Corporations Code section 25401/25540 to further the conspiracy; [¶] AND [¶] 3. *Oral false statements of a material fact* in violation of Corporations Code section 25401/25540,

55

were natural and probable consequences of the common plan or design of the crime that the defendant conspired to commit." (Italics added.)

Paragraphs 1 and 3 of the standard, unmodified, instruction provide: "The defendant conspired to commit one of the following crimes: [the target crime];" and "[the nontarget offense[s] was/were] [a] natural and probable consequence[s] of the common plan or design of the crime that the defendant conspired to commit." (CALCRIM No. 417.)

## B. Analysis

On appeal, defendant argues paragraphs 1 and 3 of the modified instruction are incongruent because "[t]he standard instruction makes clear that the crimes described in these two paragraph[s] must be different, and the standard instruction as a whole asks the jury to determine whether the crime actually charged in [the] third paragraph (the nontarget crime) was a natural and probable consequence of the crime in the first paragraph (the target crime)." But because the crimes in the modified paragraphs 1 and 3 were identical, and because the jury was elsewhere instructed that section 24501 could be violated by either "an *oral or written* communication," the jury would conclude that the target crime included both a written or oral communication.

Defendant, pointing to the instruction that "[t]his rule applies even if the act was not intended as part of the original plan," maintains the instruction allowed jurors to convict without finding defendant intended to commit the elements of section 25401: "all jurors had to find was that the crime of making false oral statements (described in paragraph 3) was a natural and probable consequence of conspiring to violate § 25401 which could be done by oral statements (described in paragraph 1)." We disagree.

A conspirator may be vicariously liable *for a crime* committed in furtherance of a conspiracy if that crime was a natural and probable consequence of the conspiracy. (*People v. Prieto* (2003) 30 Cal.4th 226, 249-250.) A conspirator is also criminally liable *for acts* done in furtherance of the conspiracy; each conspirator is responsible for

56

everything done by his or her confederates which is the natural and probable consequences of the original design or common plan. (*People v. Luparello* (1986) 187 Cal.App.3d 410, 437.) The rule "seeks to deter criminal combination by recognizing the act of one as the act of all." (*Ibid.*)

Here, one issue was whether defendant was liable for Armitage's *acts* of oral misrepresentations to investors. While both the target and nontarget offenses reference sections 25401/25540, paragraph 3 specifically refers to the "[o]ral false statements of a material fact," such as Armitage's assurances to investors. We do not think that because the jurors were elsewhere instructed that section 25401 could be violated by either oral or written communication, it would read the modified paragraph 1 to also include oral communications.

Indeed, the prosecutor's arguments to the jury clarified the point: "[T]he other crime that would fall as a natural and probable consequence of the conspiracy is the crime of Mr. Armitage making additional oral misrepresentations about the securities to the investor. What we're looking at — the target crime right now is the 25401 in written form, the PPM. Was it a natural and probable consequence that Mr. Armitage would on some occasion add verbally statements of his own for the investor to consider in addition to the PPMs that he's giving to the investor."

Considering the instructions as a whole, a jury would reasonably understand that the target offense was a violation of section 25401 in written form, and the nontarget offense was a violation of section 25401 "oral false statements of a material fact" made a coconspirator.

## X. Burglary Convictions

Defendant contends his burglary convictions cannot be based on intent to commit a section 25401 violation. He reasons that because burglary requires entry with specific intent to commit a felony, and a section 25401 violation is a crime of negligence, one cannot enter with intent to commit an unintentional crime. He is mistaken.

57

As discussed in part I of the Discussion, *ante*, securities fraud is a general intent crime, not a crime of criminal negligence. The specific intent in burglary and the knowledge element in securities fraud do not conflict, and defendant was properly convicted of burglary.

## XI.  Scheme to Defraud Instruction

As to count 2, defendant contends the trial court erred in instructing jurors he could be found guilty of "directly or indirectly" using a scheme to defraud in connection with the offer or sale of a security in violation of section 25541, without explaining the concept of "indirect" commission of a California crime. We agree but find the error harmless beyond a reasonable doubt.

### A.  Additional Background

In count 2, defendant was charged with violating section 25541, which provides: "Any person who willfully employs, *directly or indirectly*, any device, scheme, or artifice to defraud in connection with the offer, purchase, or sale of any security, or willfully engages, *directly or indirectly*, in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person in connection with the offer, purchase, or sale of any security [is guilty of a felony]."[53]  (Italics added.)

For this count, the trial court instructed jurors they could convict if the prosecution proved "direct or indirect" commission of the elements of the offense. The court, however, never defined "indirect" for the jury.

---

[53]  The jury was instructed that to prove the crime, the following elements must be proved:  (1)  "That a security was offered for sale or sold in this state"; (2)  "That in connection with the offer or sale of the security the defendant, directly *or indirectly*," did either, (a) "Willfully employed a device, scheme or artifice to defraud any person;" or (b) "Willfully engaged in an act, practice or course of business which operates or would operate as a fraud or deceit on any person"; and (3) "That the defendant did so with the specific intent to defraud."

58

## B. Analysis

On appeal, defendant argues the trial court was obligated to instruct sua sponte on the definition of "indirect." He maintains reversal is required because, although one can be vicariously liable for a section 25541 violation, the "open ended instruction" failed to convey the requisite elements of accomplice liability.

The People maintain that no such obligation existed because "indirect" is commonly understood by those familiar with the English language and is not used in a technical legal sense. On this point, we agree with defendant.

While a trial court has "[N]o duty to clarify, amplify, or otherwise instruct on commonly understood words or terms used in statutes or jury instructions," it must define technical terms that have meanings peculiar to the law. (*People v. Griffin* (2004) 33 Cal.4th 1015, 1022.) Words or phrases have a technical, legal meaning requiring clarification if they have a definition that differs from their nonlegal meaning. (*Ibid*.)

This is the case here. In a nonlegal sense, a task can be accomplished indirectly in a myriad of ways. But in the legal context, how one may commit a crime indirectly is more circumscribed. Indirect theories such as aiding and abetting, and conspiracy require proof of certain elements. Without defining "indirect," the jury was free to chart its own path in determining whether section 25541 was committed "indirectly." Accordingly, it was incumbent upon the trial court to define "indirect" and the failure to do so was error. (*People v. Breverman* (1998) 19 Cal.4th 142, 154 [the trial court must instruct on the general principles of law relevant to the issues raised by the evidence].) The trial court should have instructed that "indirect" — as it relates to employing a device, scheme, or artifice to defraud and/or engaging in any act, practice, or course of business which operates or would operate as a fraud or deceit — means to do so by aiding and abetting or as a coconspirator.

The error was nevertheless harmless given the nature of the other counts to which guilty verdicts were returned. If defendant, as charged in count 2, "employed a device,

59

scheme, or artifice to defraud," or if he engaged in an "act, practice, or course of business" that operated as a fraud, it was through the offer and sale of AREI securities to investor victims. Thus, the essence of count 2 was the same as that underlying the 25401 counts. Indeed, punishment on count 2, along with count 1, was stayed under Penal Code section 654, with the trial court finding "they were the means by which each of the 25401 sales of securities in fraudulent manner and the two burglaries were committed or they were the purpose of the burglary."

And again, as to the section 25401 counts (counts 3, 11, 12, 13, 17, 18, 20, 21, 22, 25, 26, 29, 31, 36, 37, and 41) the jury was instructed on conspiracy, including natural and probable consequences, and aiding and abetting. And because the jury was properly instructed on the section 25401 counts, and returned guilty verdicts on all but one of them, we find beyond a reasonable doubt that had the jury been instructed on the meaning of *indirect* as to count 2, it would not have altered the jury's verdict.

## XII.  The Trial Court's Reference to the Section 25401 Charges as "Securities Fraud"

Defendant contends the trial court erred in referring to a section 25401 violation as "securities fraud" when instructing the jury. He reasons that because the charged Penal Code section 186.11, subdivision (a)(2) enhancement required jurors to decide whether fraud was a material element of two of the charged felonies, by referencing section 25401 violation as "securities fraud" the court was essentially directing verdict as to that enhancement. We disagree.

### A.  Additional Background

The trial court instructed the jury that if defendant committed two or more of the section 25401 charges, it could find a Penal Code section 186.11, subdivision (a)(2) multiple felony enhancement true, so long as it also found (1) fraud was a material element of two of the section 25401 charges, (2) the charges showed a pattern of related felony conduct, and (3) the conduct resulted in a loss of more than $500,000.

60

Elsewhere, the trial court instructed as to section 25401 that, "Mr. Koenig is charged . . . *with securities fraud* in violation of Corporations Code [section] 25401." (Italics added.)

## B. Analysis

"[J]ury instructions relieving the prosecution of the burden of proving beyond a reasonable doubt each element of the charged offense violate the defendant's due process rights under the federal Constitution." (*People v. Flood* (1998) 18 Cal.4th 470, 491.) In considering whether instructional error occurred, " ' "we must consider the instructions as a whole ... [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." ' " (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)

The trial court's instructions here did not, as defendant suggests, remove an element of the enhancement or direct a verdict. A reasonable jury would have understood the trial court was using a shorthand name for a section 25401 violation and not directing a verdict. Indeed, the Penal Code section 186.11 instruction, clarified that the jury had to decide "*whether* the People have proved" all elements of the allegation, including that "[f]raud was a material element of at least two related felonies committed by the defendant." We do not see how an intelligent jury could reasonably interpret a shorthand label for a crime as directing a verdict.

## XIII. Unanimity Instruction

As to count 1, defendant challenges the trial court's failure to instruct the jury that it must unanimously agree on an overt act committed in furtherance of the conspiracy. He asserts that because the prosecutor alleged 20 separate overt acts in support of the conspiracy, the trial court should have sua sponte instructed the jury that it must unanimously agree as to which overt acts were committed. Defendant acknowledges that our high court rejected this argument in *People v. Russo* (2001) 25 Cal.4th 1124 (*Russo*), but he contends the *Russo* court did not specifically address his argument that the failure

61

to give a unanimity instruction violates his Sixth Amendment rights, citing *Apprendi v. New Jersey* (2000) 530 U.S. 466, 490 [147 L.Ed.3d 435]; *Jones v. United States* (1999) 526 U.S. 227, 243, fn. 6 [143 L.Ed.2d 311]; and *Mullaney v. Wilbur* (1975) 421 U.S. 684, 697-698 [44 L.Ed.2d 508]. We find no error.

An unanimity instruction is required if there is evidence that more than one crime occurred, each of which could provide the basis for conviction under a single count. (*People v. Diedrich* (1982) 31 Cal.3d 263, 281.) In *Russo*, a conspiracy case, our Supreme Court held that "the jury need not agree on a specific overt act as long as it unanimously finds beyond a reasonable doubt that some conspirator committed an overt act in furtherance of the conspiracy." (*Russo, supra*, 25 Cal.4th at p. 1128.) It explained: "[t]he key to deciding whether to give the unanimity instruction lies in considering its purpose. The jury must agree on a 'particular crime' [citation]; it would be unacceptable if some jurors believed the defendant guilty of one crime and other jurors believed [the defendant] guilty of another. *But unanimity as to exactly how the crime was committed is not required.* Thus, *the unanimity instruction is appropriate 'when conviction on a single count could be based on two or more discrete criminal events,' but not 'where multiple theories or acts may form the basis of a guilty verdict on one discrete criminal event.*' [Citation.] In deciding whether to give the instruction, the trial court must ask whether (1) there is a risk the jury may divide on two discrete crimes and not agree on any particular crime, or (2) the evidence merely presents the possibility the jury may divide, or be uncertain, as to the exact way the defendant is guilty of a single discrete crime. In the first situation, but not the second, it should give the unanimity instruction." (*Id*. at pp. 1134-1135, italics added.)

Defendant's attempts to distinguish *Russo* were rejected in *People v. Grimes* (2016) 1 Cal.5th 698. There, our high court applied *Russo* and specifically rejected the defendant's Sixth Amendment argument from the federal line of cases, where the prosecutor alleged five different overt acts in furtherance of the conspiracy. (*Id.* at

62

p. 725.)  It held that none of the federal cases cited by the defendant "calls into question our prior conclusion that the jurors need not agree unanimously on which overt act of a conspiracy was proved." (*Id.* at p. 726.)  The court also cited a consistent holding by the United States Supreme Court, in *Schad v. Arizona* (1991) 501 U.S. 624, 629-645 [115 L.Ed.2d 555], which held that when a defendant's alleged conduct constitutes a single discrete offense that may be committed in different ways, the federal Constitution does not require unanimity as to how the crime was committed.  (*Grimes*, at p. 726.)

Our high court having rejected defendant's argument, so too must we.  (*Auto Equity Sales*, *supra*, 57 Cal.2d at p. 455.)

## XIV.  Motion for a New Trial

Defendant contends the trial court applied the wrong standard of review in ruling on his new trial motion.  We disagree.

## A.  Additional Background

Following the verdict, defendant moved for a new trial, raising two primary arguments in support:  (1) the evidence was "insufficient to sustain the verdict" and (2) the jury "misapplied the law as instructed," based on the not-guilty verdict in count 8, its premature request for a calculator, and its failure to ask substantive questions during deliberations.

Denying the motion, the trial court observed, "I have many [times] examined as much of the record as has been argued and as I believe is necessary to evaluate, in effect, whether the defendant got a fair trial; whether the evidence that was submitted was lawful; and whether, if believed, it was sufficient to justify conviction.  And in my judgment, a positive answer applies to each of those questions.  And so, I believe the jury handled the evidence as directed."

## B.  Analysis

On appeal, defendant notes the proper standard requires the trial court to independently weigh the evidence presented (Pen. Code § 1181, subd. (6)), and he claims

that based on its comments, the trial court misunderstood its role and essentially applied an appellate sufficiency of the evidence review.

" 'The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears.' " (*People v. Williams (*1988) 45 Cal.3d 1268, 1318.) We will, however, find an abuse of discretion when the court "based its decision . . . [citation] or on an incorrect legal standard [citations]." (*People v. Knoller* (2007) 41 Cal.4th 139, 156.) In considering a new trial motion, the trial court must "independently examine[] all the evidence to determine whether it is sufficient to prove each required element beyond a reasonable doubt *to the judge*, who sits, in effect, as a '13th juror.' " (*Porter v. Superior Court* (2009) 47 Cal.4th 125, 133.) The court must evaluate "the proper weight to be accorded to the evidence" and then determine whether "sufficient credible evidence" supports the verdict. (*People v. Robarge* (1953) 41 Cal.2d 628, 633 (*Robarge*).)

Here, the trial court stated that it evaluated "whether the defendant got a fair trial; whether the evidence that was submitted was lawful; and whether, if believed, it was sufficient to justify conviction. And *in my judgment*, a positive answer applies to each of those questions." In other words, the court applied its own judgment to the question of whether there was sufficient credible evidence to support the verdict and concluded there was. (See *Robarge, supra*, 41 Cal.2d at p. 633.) That was no abuse of discretion. Nor does it indicate the trial court misunderstood its role or the scope of its review. Indeed, the trial court noted it had read the defense's written motion and the prosecution's opposition, both of which cited the proper standard: "the court must independently weigh the evidence." Thus, we presume the trial court followed the law in this regard. (See Evid. Code § 664; *People v. Mosley* (1997) 53 Cal.App.4th 489, 496 ["The general rule is that a trial court is presumed to have been aware of and followed the applicable law"].)

## XV.  Cumulative Error

Defendant finally contends the cumulative effect of the various alleged instructional errors warrants reversal.  With the exceptions of contentions 4, 5, and 11 we have found no error.  We conclude those errors had no effect on the other contentions raised or the trial as a whole.  We therefore find no cumulative error.

### DISPOSITION

We affirm.

_____/s/_____
MURRAY, J.

We concur:

_____/s/_____
HULL, Acting P. J.

_____/s/_____
ROBIE, J.